# United States Court of Appeals
## For the First Circuit

No. 18-2235

RICHARD J. LYMAN, WILLIAM F. WELD, and
ROBERT D. CAPODILUPO,

Plaintiffs, Appellants,

v.

CHARLES D. BAKER, in his official capacity as
Governor of the Commonwealth of Massachusetts; and
WILLIAM FRANCIS GALVIN, in his official capacity as
Secretary of the Commonwealth of Massachusetts,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

David Boies, with whom James P. Denvir III, Amy J. Mauser, Karen L. Dunn, Lisa Barclay, Amy L. Neuhardt, Hamish P.M. Hume, Melissa Shube, Trevor P. Stutz, Nafees Syed, Boies Schiller Flexner LLP, Jennifer D. Hackett, James R. Martin, Allison M. Vissichelli, Zelle LLP, Mark Guerrero, Mary Whittle, Guerrero & Whittle PLLC, Randall L. Allen, Alston & Bird LLP, David H. Fry, J. Max Rosen, Michael B. Desanctis, Munger, Tolles & Olson LLP, Scott A. Martin, Irving Scher, Jeanette Bayoumi, Michael D. Hausfeld, Swathi Bojedla, Hausfeld LLP, María Amelia Calaf, Jack A. Simms, Jr., Ryan A. Botkin, Katherine P. Chiarello, Karen S. Vladeck, W. Reid Wittliff, Wittliff Cutter Austin, PLLC, and Samuel Issacharoff, were on brief, for appellants.

Amy Spector, Assistant Attorney General, with whom Maura Healey, Attorney General, and Robert E. Toone, Assistant Attorney General, were on brief, for appellees.

March 31, 2020

TORRUELLA, **Circuit Judge**.  The appellants in this case are three Massachusetts voters who challenge the constitutionality of the winner-take-all method for selecting presidential electors that Massachusetts has adopted pursuant to its authority under Article II of the United States Constitution.  They allege that the winner-take-all elector-selection method violates their right to an equally weighted vote under the Equal Protection Clause of the Fourteenth Amendment as well as their associational rights under the First and Fourteenth Amendments.  The district court dismissed their complaint for lack of standing and failure to state a claim.  Even though we determine that the appellants do have standing to bring their claims, we agree that they have failed to state a claim upon which relief can be granted under either of their constitutional theories.  Therefore, we affirm.

**I.**

A.  **Factual Background**

Because this is an appeal from the granting of a motion to dismiss, "we rehearse the facts as they appear in the plaintiffs' complaint[] (including documents incorporated by reference therein)."  Hochendoner v. Genzyme Corp., 823 F.3d 724, 728 (1st Cir. 2016).

The United States elects its president and vice president through the Electoral College, which is a body of

-3-

electors appointed by each state in proportion to its representation in the Senate and the House of Representatives. U.S. Const. art. II, § 1, cl. 2; id. amend. XII. The candidate that receives a majority of those electors' votes wins the presidency. See id. amend. XII.[1]

Pursuant to its constitutional authority, the Commonwealth of Massachusetts ("Massachusetts") has enacted a statutory scheme that provides for the appointment of electors for president and vice president on a winner-take-all basis (the "WTA system"). See id. art. II, § 1, cl. 2; see generally Mass. Gen. Laws ch. 53-54. The core statutes providing the structure of the WTA system are established in Massachusetts General Laws chapter 53, section 8, as well as chapter 54, sections 43, 118, and 148. Chapter 53, section 8 states that "[t]he state committees of the respective political parties . . . shall nominate the presidential electors" for their parties, which "shall include a pledge by the presidential elector to vote for the candidate named in the filing." Chapter 54, section 43 provides:

> The names of the candidates for presidential electors shall not be printed on the ballot, but in lieu thereof the surnames of the candidates of each party for president and vice president shall be printed thereon in one line under the designation "Electors

---

[1] The Twelfth Amendment also provides a mechanism for resolving a situation in which no candidate receives a majority of the electoral votes.

of president and vice president" and arranged in the alphabetical order of the surnames of the candidates for president, with the political designation of the party placed at the right of and in the same line with the surnames.

Section 118 of the same chapter proclaims:

The copies of the records of votes for presidential electors shall . . . be examined by the governor and council, who shall thereafter declare . . . the names of the persons who have received at least one-fifth of the entire number of votes cast for electors, and the number of votes received by each such person. The several persons, to the number of electors required to be chosen, who have received the highest number of votes so ascertained . . . shall . . . be deemed to be elected . . . .

Mass. Gen. Laws ch. 54, § 118 (emphasis added).  Finally,

section 148 provides:

The persons chosen as presidential electors shall meet at the state house on the date fixed by federal law next following their election . . . and organize by the choice of a presiding officer and secretary. The state secretary shall call the meeting to order, call the roll of electors, and preside until a presiding officer shall be chosen.  The secretary of the electors shall keep a journal of their proceedings and deposit the same in the office of the state secretary, where it shall be recorded and filed.

Id. § 148.  As forty-seven other states plus the District of

Columbia employ a version of it, the WTA system for appointing

electors is the national norm.

What makes the combined effect of this statutory scheme

winner-take-all is that the political party of the candidate who

wins the popular vote in Massachusetts (by a majority or even a

-5-

plurality) claims all eleven of Massachusetts's electors. Specifically, since Massachusetts mandates that its eleven electors vote for their party's candidate,[2] see Mass. Gen. Laws ch. 53, § 8, winning the popular vote (regardless of the margin of victory) guarantees that all of Massachusetts's electoral votes go to that party's candidate, see Mass. Gen. Laws ch. 54, § 118.

By way of example, the Democratic candidate in the 2016 presidential election, Hillary R. Clinton, received 60% of the votes (1,995,196 votes) in Massachusetts's statewide election and therefore took all eleven electors. Meanwhile, now-President Donald J. Trump received 32.8% of the votes (1,090,893 votes) but took no electors. The 7.2% of the votes cast for other candidates, such as the Libertarian candidate, Gary Johnson, similarly yielded no electoral votes.

Richard J. Lyman, William F. Weld, and Robert D. Capodilupo (together "Appellants") reside and vote in Massachusetts. Weld, a former Republican Governor of Massachusetts, is currently a registered Libertarian. Lyman, a

---

[2] The intention behind this provision is to neutralize the infamous "faithless elector" problem, whereby electors vote independently of their sponsoring party's preference. See Baca v. Colo. Dep't of State, 935 F.3d 887 (10th Cir. 2019), cert. granted, No. 19-518, 2020 WL 254162 (U.S. Jan. 17, 2020) (reviewing the constitutionality of Colorado's law requiring its presidential electors to adhere to the mandate expressed in the state-wide popular vote when casting their ballots in the Electoral College).

former senior official under two Republican Governors of Massachusetts (including Weld), and Capodilupo are both registered Republicans. Appellants have consistently voted for non-Democratic presidential candidates (i.e., Republican, Libertarian, or otherwise), and they intend to continue casting their ballots along such lines in future elections. Their grievance stems from the observation that the Democratic candidate has won the popular vote in Massachusetts (and thus all its electors) in each of the last eight presidential elections. Notably, "the same phenomenon occurs in reverse in heavily Republican states . . . ."

## B. Procedural Background

On February 21, 2018, Appellants sued Charles D. Baker, the current Republican Governor of Massachusetts, and William Francis Galvin, the current Secretary of Massachusetts (together "the Commonwealth"), in their official capacities to challenge the constitutionality of the WTA system as applied in Massachusetts.[3] Appellants are careful to stipulate that their quarrel is not with

---

[3] On the same day, Appellants' counsel filed parallel lawsuits on behalf of voters in California, South Carolina, and Texas that challenge the constitutionality of the WTA systems as applied in those states. See League of United Latin Am. Citizens v. Abbott, 951 F.3d 311 (5th Cir. 2020); Baten v. McMaster, 374 F. Supp. 3d 563, 565-66 (D.S.C. 2019), appeal pending, No. 19-1297 (4th Cir.); Rodríguez v. Brown, No. 2:18-cv-001422, 2018 WL 6136140, at *2 (C.D. Cal. Sept. 21, 2018), appeal pending, No. 18-56281 (9th Cir.).

the Electoral College itself, which they acknowledge is mandated by the Constitution.  In their complaint, Appellants allege two causes of action.  First, they asseverate that the WTA system "violates the 'one person, one vote' principle" enshrined in the Equal Protection Clause of the Fourteenth Amendment (Count 1).  Second, they assert that the WTA system "poses a severe burden" on their First and Fourteenth Amendment rights to "associate and to effectively express their political preference through voting that is not outweighed by any legitimate state interest" (Count II).

Appellants premise their equal protection claim on the notion that the "consequence" of the WTA system is that "votes for a losing presidential candidate are counted . . . only to be discarded when another candidate wins more votes . . . ."  Thus, they contend that "if an individual does not vote for the winning candidate in Massachusetts, that person's vote translates into no representation in the state's multi-member Electoral College delegation."  Appellants allege that this rises to the level of arbitrary and disparate treatment that undermines the precept of "one person, one vote."

The essence of Appellants' associational rights claim is that by discarding their votes for President and thus "limiting [their] ability to express their political preferences," the WTA system "deprives" them of their "associational rights" simply

because of their "political association and expression of political views at the ballot box."  By ensuring that Appellants' (and similarly situated voters') "voices are not heard," the WTA system allegedly incentivizes presidential candidates to disproportionately focus their campaigning activities in key "'battleground' states" (e.g., Florida, North Carolina, Ohio, and Pennsylvania), or swing states, with greater potential for positive electoral returns.  Relatedly, Appellants allege that this feature contributes to the increasing vulnerability of the American election system to outside influences, such as hacking orchestrated by foreign governments.

In their prayer for relief, Appellants seek a declaration of the WTA system's unconstitutionality as well as a corresponding injunction that would bar Massachusetts from implementing the WTA system for selecting electors, or any other constitutionally defective system, including the "selection by Congressional District vote," in which states conduct elections for individual electors in each of their congressional districts. Additionally, they ask the district court to "set reasonable deadlines for [Massachusetts] authorities to propose and then implement" a valid method of selecting electors.  If Massachusetts authorities fail to meet the deadlines, Appellants ask the district court to "order a proportional method of distributing Electors,

selecting a proportional number of Electors to each party, based on the number of votes each party's candidate receives statewide."

On May 21, 2018, the Commonwealth moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of standing and for failure to state a claim upon which relief may be granted, respectively. Following a hearing, on December 7, 2018, the district court granted the Commonwealth's motion to dismiss the complaint in its entirety. Lyman v. Baker, 352 F. Supp. 3d 81, 92 (D. Mass. 2018). On December 12, 2018, Appellants timely appealed.

## C. The District Court's Opinion

The district court allowed the Commonwealth's motion to dismiss Appellants' complaint because it found the WTA system to be a valid exercise of Massachusetts's authority free of constitutional defect. Lyman, 352 F. Supp. 3d at 84. The court predicated its dismissal on the interrelatedness of the Rule 12(b)(1) and Rule 12(b)(6) inquiries in the context of the alleged constitutional violations. Because of its view (and the parties' agreement) that the "injury-in-fact analysis overlaps with the merits of plaintiffs' constitutional claims," the district court proceeded directly to analyze the merits of the claims under the "well-established standard for Fed. R. Civ. P. 12(b)(6)." Id. at 85.

-10-

As an initial matter, the court held that the Supreme Court's summary affirmance in Williams v. Va. State Bd. of Elections, 288 F. Supp. 622 (E.D. Va. 1968), aff'd, 393 U.S. 320 (1969) (per curiam), which upheld Virginia's winner-take-all voting system against an equal protection challenge, is binding precedent that requires the dismissal of Appellants' claims because it satisfied both prongs of the standard set forth in Mandel v. Bradley, 432 U.S. 173, 176 (1977) (stating that summary affirmances "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions"). Lyman, 352 F. Supp. 3d at 85-86. Appellants argued that Williams is not controlling because: (a) there are factual distinctions between the voting laws of Virginia and Massachusetts,[4] and (b) "important doctrinal shifts" in voter dilution law have since "diminish[ed] its precedential value." Id. at 86-88. The court rejected these contentions.

Next, the district court held that even if Williams did not control, Appellants' claims "would still fail for reasons that

---

[4] Appellants specifically pointed to the fact that unlike Virginia in Williams, Massachusetts does not list the names of the individual electors on its ballots, see Mass. Gen. Laws ch. 54, § 43, and it binds electors to vote for the chosen candidate by statute, see Mass. Gen. Laws ch. 53, § 8 (requiring presidential electors to "pledge . . . to vote for the candidate named in the filing").

-11-

substantially mirror those given by the three-judge panel in that case," which is to say that the WTA system does not violate the "one person, one vote" principle because it does not treat Appellants' votes disparately or arbitrarily. Id. at 88-89. No matter the valid policy reasons for and against the WTA system, the district court concluded that the Constitution's concession of "plenary power to the state legislatures in the matter of the appointment of electors," id. at 88 (alteration in original) (quoting McPherson v. Blacker, 146 U.S. 1, 35 (1892), as well as its endorsement of the numerical unfairness implicit in the Electoral College, posed too great of an obstacle to Appellants' challenge to a voting scheme that does not "treat voters differently" or "inherently favor or disfavor a particular group of voters," id. at 89 (citing McPherson, 146 U.S. at 40). Tying the analysis back to standing, the court concluded that Appellants had therefore failed to allege a legally cognizable harm under the Equal Protection Clause. Id. at 91.

Turning to the Appellants' First Amendment claim, the district court rejected the argument that the WTA system "discard[s]" or "dilut[es]" the votes of minority party members by reason of those members' political views. Id. at 91 (citing Vieth v. Jubelirer, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring)). Determining that "whatever disadvantage the losing party and its

members suffer is a function solely of their lack of electoral success," the court concluded that Appellants failed to "allege an associational burden for purposes of a First Amendment claim." Id. Again, the court reiterated that in the absence of a constitutional violation, there could be no legally cognizable harm for purposes of standing. Id.

Because Appellants had "failed to allege legally cognizable injuries under the Equal Protection Clause or the First Amendment," the district court concluded that they had "also failed to allege an injury to a legally protected interest for the purposes of standing." Id. at 91. After finding that Appellants had not suffered an injury-in-fact, the district court briefly turned its attention to the question of redressability. Even if Appellants had suffered a cognizable injury, the court reasoned that their claims were ultimately "unredressable" because federal courts lack the constitutional power "to affirmatively dictate what type of elector-allocation system [a state] must use." Id. at 92. In the court's view, ordering a state to implement a particular elector allocation system was inconsistent with the Constitution's delegation of such authority to the states and the Supreme Court's interpretation of that power as plenary. Id. (citing Bush v. Gore, 531 U.S. 98, 104 (2000)). Accordingly, the district court stated that the relief Appellants sought could only

-13-

come from a change to Massachusetts state law or an amendment to the U.S. Constitution.  Id. (citing Williams, 288 F. Supp. at 629, for the proposition that "any other proposed limitation on the selection by the State of its presidential electors would require Constitutional amendment").

With this background in place, we begin our discussion of the issues.

## II.

We review de novo the granting of a motion to dismiss for both lack of standing under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).  See Blum v. Holder, 744 F.3d 790, 795 (1st Cir. 2014); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  Although appellate review of a dismissal under Rules 12(b)(1) and 12(b)(6) are "conceptually distinct," we have stated that "the same basic principles apply in both situations."  Hochendoner, 823 F.3d at 730-31 (noting the "parallelism" between the approach we take as to the standard of review, burden of proof at the pleading stage, and posture towards the facts alleged in the complaint).  Thus, we need only articulate these principles once, and we do so under the well-established Rule 12(b)(6) standard.

For the purposes of our review, we "isolate and ignore statements in the complaint that simply offer legal labels and

-14-

conclusions or merely rehash cause-of-action elements." Schatz, 669 F.3d at 55 (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7, 12 (1st Cir. 2011) (discussing, among other cases, Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007))); see also Hochendoner, 823 F.3d at 731. Second, we "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55 (citing Ocasio-Hernández, 640 F.3d at 12); see also Blum, 744 F.3d at 795. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.'" Schatz, 669 F.3d at 55 (quoting Iqbal, 556 U.S. at 679); see also Hochendoner, 823 F.3d at 730-31. Finally, in the course of our review, "we can consider (a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in [the] plaintiff's 'response to the motion to dismiss.'" Schatz, 669 F.3d at 55-56 (footnote omitted) (quoting Arturet-Vélez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005)).

After careful consideration, we find that Appellants

have, in fact, established standing to bring their equal protection and associational rights claims sufficient to survive a Rule 12(b)(1) motion to dismiss. However, we agree with the district court that Appellants' claims cannot survive dismissal under Rule 12(b)(6). Accordingly, we affirm the dismissal of Appellants' complaint.

## A. Standing

The parties first dispute whether the district court properly dismissed Appellants' claims for lack of standing under Rule 12(b)(1), centering their arguments on the injury-in-fact and redressability prongs of the well-established inquiry. "Standing doctrine assures respect for the Constitution's limitation of '[t]he judicial Power' to 'Cases' and 'Controversies.'" Hochendoner, 823 F.3d at 731 (alteration in original) (quoting U.S. Const. art. III, § 2, cl. 1). The core focus of the inquiry is "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Mass. v. U.S. Dep't of Health & Human Servs., 923 F.3d 209, 221 (1st Cir. 2019) (quoting Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008)). "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." Hochendoner, 823 F.3d at 731 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).

An injury-in-fact is the invasion of a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted). Concreteness and particularity are two separate requirements. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1545 (2016). To be concrete, an injury must "actually exist"; it cannot be "abstract." Id. at 1548. For an injury to be "particularized," it must go beyond a "generalized grievance[]," DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344, 348 (2006) (citation omitted), to manifestly "affect the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560 n.1. Injuries that are too "widely shared" or are "comparable to the common concern for obedience to law" may fall into the category of generalized grievances about the conduct of government. Becker v. Fed. Election Comm'n, 230 F.3d 381, 390 (1st Cir. 2000); see Lance v. Coffman, 549 U.S. 437, 442 (2007).

Causation is established by demonstrating a causal connection "between the injury and the conduct complained of," where the injury is "fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560-61 (alterations in original) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).

-17-

Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (quoting Simon, 426 U.S. at 38, 43).

Appellants contest the district court's finding that they lack standing because they maintain that the WTA system inflicts sufficiently concrete and particularized injuries by unequally diluting the strength of their votes for non-Democratic presidential candidates and depriving them of their right of political association. They also dispute the district court's findings about the "unredressability" of their claims because, in their view, the court plainly has the authority to declare the WTA system in Massachusetts unconstitutional and to enjoin its use without requiring the adoption of a proportional allocation system, and because, in the alternative, the court may nevertheless opt to grant declaratory relief alone.

In full disagreement, the Commonwealth maintains that Appellants cannot plausibly have suffered an injury to their legally protected voting or associational interests on account of the challenged WTA system because Massachusetts's power to determine its method of appointing presidential electors is plenary and the WTA system is devoid of constitutional infirmity. Moreover, in the Commonwealth's view, Appellants simply have not suffered a concrete and particularized injury because the winner-

take-all method applies to every voter who casts a ballot in presidential elections administered in Massachusetts and because Appellants cannot show that they have been prevented from voting for the presidential candidates of their choice. Finally, inter alia, the Commonwealth contends that Appellants' claims are not redressable because even a favorable result would not impact the selection method in the forty-seven other states (plus the District of Columbia) that use a WTA method.

We hold that Appellants have plausibly alleged an invasion of their constitutionally protected voting rights sufficient to survive a Rule 12(b)(1) motion to dismiss. While folding the injury-in-fact inquiry into the 12(b)(6) analysis has intuitive appeal where the alleged injury is a constitutional violation, it cannot be that a party only establishes Article III standing on a "one person, one vote" or associational rights claim by virtue of having successfully stated a claim for relief. "'[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage. Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018) (quoting Baker v. Carr, 369 U.S. 186, 206 (1962)). In fact, in Baker, considering Tennessee residents' claim that their state's redistricting plan violated the Fourteenth Amendment, the Supreme Court determined that "[i]t would not be necessary to decide whether appellants'

allegations of impairment of their votes by the 1901 appointment, will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it." 369 U.S. at 207-08. The appellants in Baker had standing because they were "asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes," and not merely a generalized grievance. Id. at 208 (internal quotation marks omitted). By the same token, Appellants here have at least plausibly alleged a sufficiently concrete and particularized injury-in-fact to survive a Rule 12(b)(1) motion to dismiss. As alleged in their complaint, Appellants reside and vote in Massachusetts and their presidential candidates of choice (at least in the past eight elections) have not received a single electoral vote from Massachusetts because of the manner in which the WTA system allegedly dilutes the strength of their votes for non-Democratic candidates and deprives them of their right of political association. The voter, after all, is presumptively the best person to bring a challenge to an alleged infringement of her constitutionally protected voting rights. See Gray v. Sanders, 372 U.S. 368, 375 (1963) (stating that "any person whose right to vote is impaired has standing to sue" (citation omitted)). We are also satisfied that Appellants have satisfied their burden of showing that the alleged injuries can be fairly traced to Massachusetts's use of the WTA system.

Finally, the alleged injury is indeed redressable. Although we surely cannot order Massachusetts to adopt any one particular elector-selection method over another, it is well within the scope of our authority to rule on whether, in enacting the WTA system, Massachusetts has exercised its plenary power "in a way that violates other specific provisions of the Constitution." Williams v. Rhodes, 393 U.S. 23, 29 (1968); see also McPherson, 146 U.S. at 24 (holding that challenge to state's electoral allocation law did not present a political question). To that end, if a federal court declared Massachusetts's WTA system to be unconstitutional, it could enjoin its use without requiring Massachusetts to adopt Appellants' preferred proportional allocation system. See Larson v. Valente, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." (emphasis in original)).

Importantly, a finding of standing here is consistent with the three-judge panel's decision in Williams, which resolved that the Virginia plaintiffs in that case (qualified voters from each congressional district) did "have the requisite standing" to challenge Virginia's winner-take-all system on equal protection grounds even though the panel ultimately rejected the claim on its

-21-

merits.  288 F. Supp. at 625.  We also note that none of the mirror-image suits filed in the Fourth, Fifth, and Ninth Circuits implicate the same standing issue, which seems to be because the defendants in those cases did not move to dismiss under Rule 12(b)(1).  See League of United Latin Am. Citizens, 951 F.3d at 314, 318 (affirming dismissal of claims on Rule 12(b)(6) grounds); Baten, 374 F. Supp. 3d at 565-66 (dismissing claims on Rule 12(b)(6) grounds); Rodríguez, 2018 WL 6136140, at *4 (dismissing claims on Rule 12(b)(6) grounds and declining to find that the claims presented nonjusticiable political questions mandating Rule 12(b)(1) dismissal).  Even if the respective motions to dismiss in those cases did not raise the standing issue, the fact that none of the aforementioned courts raised it sua sponte can be given at least some weight.  See In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007) (noting the obligation "to inquire sua sponte into our [subject matter] jurisdiction" (quoting Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005))).

Having established, contrary to the district court's determination, that Appellants have indeed established the requisite standing to survive the Rule 12(b)(1) motion to dismiss, we proceed to assess their equal protection and associational rights claims under Rule 12(b)(6).

-22-

**B.  "One Person, One Vote" Claim**

We begin by assessing whether Appellants' allegations plausibly support a claim that the WTA system violates the "one person, one vote" principle embedded in the Equal Protection Clause of the Fourteenth Amendment.  As an initial matter, Appellants challenge the district court's determination that the Supreme Court's summary affirmance in Williams is controlling.  Next, Appellants defend their equal protection claim by splitting it into two theories.  First, based on the contents of footnote 12 in Gray, 372 U.S. at 381 n.12[5] -- which Appellants term the case's second, independent holding -- they argue that the WTA system discards their votes for a non-majority candidate at the first step of a two-step presidential election.  Second, they posit that the WTA system could alternatively be viewed as an at-large election for a multimember district of electors, which unconstitutionally dilutes the strength of their votes.  As we will explain, we reject these contentions.

---

[5]  Specifically, Appellants point to the language in footnote 12, which states that in the context of Georgia's county-unit system (which we will later describe in detail), "the weighting of the votes would continue, even if unit votes were allocated strictly in proportion to population" because the votes for the candidate who loses the county popular vote would be "worth nothing and [would] be[] counted only for the purpose of being discarded." Gray, 372 U.S. at 381 n.12.

**1.**

According to the constitutional blueprint for implementing the Electoral College, the States alone (through their legislatures) possess the power to determine the manner of appointing presidential electors. See U.S. Const. art. II, § 1, cl. 2; id. amend. XII. The text of the Elector Clause reads: "Each state shall appoint in such Manner as the Legislature thereof may direct, a Number of Electors equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." Id. art. II, § 1, cl. 2. In interpreting the bounds of the Elector Clause, the Supreme Court has stated that "[t]he state legislature's power to select the manner for appointing electors is plenary." Bush, 531 U.S. at 104 (citing McPherson, 146 U.S. at 35). It is precisely for this reason that the Constitution does not prescribe or endorse any selection method in particular. See McPherson, 146 U.S. at 28 ("The final result [of the constitutional convention] . . . reconciled contrariety of views by leaving it to the state legislatures to appoint directly by joint ballot or concurrent separate action, or through popular election by districts or by general ticket, or as otherwise might be directed."); see also id. at 27 ("The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket,

-24-

nor that the majority of those who exercise the elective franchise can alone choose the electors."). State legislatures have utilized a variety of appointment mechanisms since the framing of the Constitution, but in recent memory, "[h]istory has . . . favored the voter." Bush, 531 U.S. at 104.[6] Of course, the hand that giveth, also taketh away (if it so desires). See id. (citing McPherson, 146 U.S. at 35) ("The State . . . after granting the franchise in the special context of Article II, can take back the power to appoint electors.").[7]

Plenary as a state legislature's power to dictate the manner of appointing presidential electors may be, it is not beyond judicial review. On the contrary, it is "always subject to the

---

[6] Only Nebraska and Maine have adopted an alternative to the WTA system. They employ a hybrid version of district voting. See Me. Rev. Stat. Ann. tit. 21-A, § 805.2 (2020); Neb. Rev. Stat. § 32-714 (2019). Under this modern iteration, the candidate who wins the statewide popular vote receives the two at-large electoral votes (i.e., the two votes each state is entitled to for its senatorial representation), and the candidate who wins a plurality of the votes in each congressional district receives one electoral vote for that district (i.e., two in Maine and three in Nebraska).

[7] For example, in advance of the 1800 presidential election, the Massachusetts legislature took back the appointment power from its citizens and picked the electors itself. See Neal R. Peirce, The People's President: The Electoral College in American History and the Direct-Vote Alternative 67 (1968). Historically, the Massachusetts legislature experimented quite frequently before settling on the WTA system. Between 1804 and 1820 alone, Massachusetts rotated through the general ticket system (1804), a joint ballot of the legislature (1808, 1816), and the congressional district system (1812, 1820), only to return to the general ticket system in 1824. See McPherson, 146 U.S. at 32.

limitation that [it] may not be exercised in a way that violates other specific provisions of the Constitution." Rhodes, 393 U.S. at 29; see also Williams, 288 F. Supp. at 626 (noting that in order to pass muster, "the manner of appointment must itself be free of Constitutional infirmity"). The Equal Protection Clause of the Fourteenth Amendment is one such well-established limitation (the First Amendment is another, as we will explain later). See Rhodes, 393 U.S. at 29 ("[N]o State can pass a law regulating elections that violates the Fourteenth Amendment[] . . . ."); Wesberry v. Sanders, 376 U.S. 1, 17-18 (1964) ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [their] right [to vote].").

The Equal Protection Clause guarantees that the government will not treat "those who are similarly situated" differently. In re Subpoena to Witzel, 531 F.3d 113, 118 (1st Cir. 2008); see U.S. Const. amend. XIV, § 1 ("[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."). In the context of voting rights, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush, 531 U.S. at 104—05 (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 665 (1966)).[8]

---

[8]  Importantly for our analysis, citizens do not have a "federal

In this manner, the Equal Protection Clause safeguards the "equal weight accorded to each vote and the equal dignity owed to each voter." Id. at 104. This is the meaning of "one person, one vote," a steadfast democratic principle which the Supreme Court articulated in Gray, 372 U.S. at 381. At its core, the precept stands for the "idea that every voter is equal to every other voter in his State." Id. at 380. In other words, once states establish a geographical unit for electing a political representative, "all who participate in the election are to have an equal vote--whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit." Id. at 379; see also Burns v. Richardson, 384 U.S. 73, 88 (1966) (recognizing that electoral systems cannot be used to "cancel out the voting strength of racial or political elements of the population" (quoting Fortson v. Dorsey, 379 U.S. 433, 439 (1965))).

One-person, one-vote jurisprudence thus requires states to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." Hadley v. Junior Coll.

---

constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." Bush, 531 U.S. at 104 (citing U.S. Const. Art. II, § 1).

Dist. of Metro. Kan. City, 397 U.S. 50, 54 (1970). "[T]he crucial consideration is the right of each qualified voter to participate on an equal footing in the election process." Id. at 55. As the Supreme Court has recognized, "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." Shaw v. Reno, 509 U.S. 630, 640-41 (1993) (alteration in original) (emphasis omitted) (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 569 (1969)); see also Reynolds v. Sims, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). Along these lines, one's right to vote is impaired to an unconstitutional degree when the weight of one's vote is substantially diluted in comparison with the votes of citizens living elsewhere in the state. See, e.g., Moore v. Ogilvie, 394 U.S. 814, 819 (1969) ("The idea that one group can be granted greater voting strength than another is hostile to the one [person], one vote basis of our representative government."). Therefore, now that Massachusetts has decided to let its citizens choose by ballot which presidential candidate Massachusetts will support with its electoral votes, that balloting is subject to the "one person, one vote" principle

-28-

embedded in the Equal Protection Clause of the Fourteenth Amendment.

**2.**

Appellants' challenge to Massachusetts's WTA system for selecting presidential electors on equal protection grounds is not the first of its kind.  In Williams, Virginia voters challenged the Commonwealth of Virginia's use of an analogous WTA system known as the "unit rule."  See 288 F. Supp. at 624, 626 (considering "whether Article II, Section 1 considered alone or with Constitutional safeguards, permits the selection of the electors by a general election in which the entire electorate of the State may collectively vote at one time upon all of the electors").[9] After granting certiorari, the Supreme Court summarily affirmed the decision of the three-judge panel of the district court in a

---

[9]  There is historical irony in the link between the challenges to Virginia's and Massachusetts's WTA systems.  As is now legend, after John Adams (of Massachusetts) defeated Thomas Jefferson (of Virginia) in the 1796 presidential election by a three-vote margin, Virginia switched from the district system (which it had used in the first three presidential elections) to the general ticket system (whereby electors are selected on a winner-take-all basis by a statewide popular vote) to ensure that all of its twenty-one electoral votes would go to a single party's candidate.  See Peirce, supra note 7, at 64-66; see also Letter from Thomas Jefferson to James Monroe (Jan. 12, 1800) in 9 The Works of Thomas Jefferson, 90 (Paul Leicester Ford, ed. 1904) ("[All agree that an election by districts would be best, if it could be general; but while [ten] states ch[oose] either by their legislatures or by a general ticket, it is folly [and] worse than folly for the other [six] not to do it.").

per curiam opinion and then denied a motion for rehearing. See Williams, 393 U.S. 320, reh'g denied, 393 U.S. 1112 (1969) (per curiam). Given the clear overlap of issues, a citation to Williams would, in our view, decide the present case but for the fact that Williams remains good law as a one-line summary affirmance by the Supreme Court instead of a merits opinion. We thus echo the district court in the case at hand: the Supreme Court's summary affirmance is not necessarily an endorsement of the three-judge panel's reasoning. See Lyman, 352 F. Supp. 3d at 86 (citing Mandel, 432 U.S. at 176). To that end, summary actions are meant to be understood as "applying principles established by prior decisions to the particular facts involved" and not as "breaking new ground." Mandel, 432 U.S. at 176. Nevertheless "[t]hey do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Id.; see also Anderson v. Celebrezze, 460 U.S. 780, 784 n.5 (1983). For substantially the same reasons articulated by the district court below (with a few tweaks), we agree that Williams requires the dismissal of Appellants' equal protection claim at this stage.

Williams decides the core equal protection issue presented by this appeal: whether Massachusetts's WTA system

undermines the "one person, one vote" principle.[10]  The Williams plaintiffs were ten Virginia voters who shared the conviction that Virginia's unit rule undermined the original intent of the Elector Clause that electors ought to be chosen on a district-by-district basis like congressional representatives -- a sentiment which Appellants in this case share.  See Williams, 288 F. Supp. at 625; Opening Brief of Plaintiffs-Appellants at 8, Lyman v. Baker, No. 18-2235 (1st Cir. Apr. 17, 2019) ("WTA, which in modern times makes the role of Electors purely ministerial, is inconsistent

---

[10]  In the aforementioned parallel case, the Fifth Circuit held that the Supreme Court's summary affirmance in Williams required the dismissal of the appellants' equal protection challenge to Texas's WTA system, rejecting along the way all of the same arguments that Appellants make here as to why Williams does not control.  See League of Latin Am. Citizens, 951 F.3d at 314-317. Additionally, we note -- as the district court did -- that the Fourth and Ninth Circuits have also considered and rejected equal protection challenges to WTA systems.  See Williams v. North Carolina, No. 3:17-cv-00265, 2017 WL 4935858, at *1 (W.D.N.C. Oct. 31, 2017) (rejecting challenge to North Carolina's WTA system as "decisively foreclosed by binding precedent"), aff'd sub nom. Williams v. N.C. State Bd. of Elections, 719 F. App'x 256 (mem) (4th Cir. 2018); Conant v. Brown, 248 F. Supp. 3d 1014, 1025 (D. Or. 2017) (holding challenge to Oregon's WTA system to be defeated because "Williams is still good law"), aff'd, 726 F. App'x 611 (9th Cir. 2018).  Other lower courts have reached similar results too.  See, e.g., Schweikert v. Herring, No. 16-cv-00072, 2016 WL 7046845, at *1 (W.D. Va. Dec. 2, 2016) (dismissing challenge to Virginia's WTA system because "[t]he precise issue contained in [the] complaint was . . . dismissed, and affirmed summarily" in Williams); Hitson v. Baggett, 446 F. Supp. 674, 676 (M.D. Ala.) (dismissing challenge to the "statewide and at-large features" of Alabama's WTA system), aff'd without opinion, 580 F.2d 1051 (5th Cir. 1978), cert. denied, 439 U.S. 1129 (1979).

with [the original] design."). Seeking declaratory and injunctive relief -- just as Appellants did below -- they challenged Virginia's WTA system vis-à-vis three causes of action, the second of which presented the precise issue raised by Appellants. Williams, 288 F. Supp. at 623-24. Specifically, the Williams plaintiffs alleged that "the general ticket method violates the 'one-person, one-vote' principle of the Equal Protection Clause of the Fourteenth Amendment, i.e., the weight of each citizen's vote must be substantially equal to that of every other citizen." Id. at 624 (citing Gray, 372 U.S. at 381). The district court noted that plaintiffs imputed unfairness to the plan "because it g[ave] the choice of all of the electors to the statewide plurality of those voting in the elections -- 'winner take all' -- and accord[ed] no representation among the electors to the minority of the voters." Id. at 623.

Deferential to the Elector Clause's broad grant of authority to the States, the three-judge panel in Williams rejected the equal protection claim because it saw "nothing in [Virginia's] unit rule offensive to the Constitution." Id. at 627. In fact, to reach its decision on the exact issue presented here, the district court considered some of the same "possible objectionable results" of the WTA system that Appellants allege in their complaint. Id. Namely, this list included the risk of "minority

presidents" (<u>i.e.</u>, when a candidate wins a majority of the electoral votes despite losing the popular vote), and most importantly, the "disenfranchisement defect" (<u>i.e.</u>, that the unit system "extinguishes the voice" of up to "49 percent of a State's voters" by allowing "State majorities to speak for them").  <u>Id.</u> Ultimately, the <u>Williams</u> court concluded:

> [I]t is difficult to equate the deprivations imposed by the unit rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection.  In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes.  This is in a sense discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious.  No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

<u>Id.</u>

Appellants first argue that the district court erroneously relied on <u>Williams</u> in dismissing their equal protection claim because <u>Williams</u> never addressed their exact "contention that WTA discards votes at the first step of a two-step election as condemned in <u>Gray</u> footnote 12."  Appellants emphasize the narrowness of the deference we ought to afford summary orders and propose that we only adhere to them when "the factual and legal issues presented" are "identical."  At the same time, Appellants

-33-

also maintain that the district court misunderstood their argument as "being rooted in . . . factual distinctions" between Virginia's and Massachusetts's WTA systems. Although they maintain that the factual differences they alleged are not "meaningless," Appellants note that their more "basic point" is that their claim evades Williams's limited wingspan because it turns on "Gray's second holding in footnote 12," which neither the Williams court nor its plaintiffs endeavored to cite or distinguish.

However, Williams did not, as Appellants assert, only consider the WTA system as "a one-step election for a state-level body." In fact, the two-step election critique (i.e., that the WTA system causes individual votes to "lose their effect on the outcome at a preliminary stage in the counting," in the sense that those votes are not tallied when determining the winner on the national stage) made more than a mere cameo. See Williams, 288 F. Supp. at 627. The court expressly weighed the issue, but it ultimately rejected the two-step critique because it was more persuaded by the notion that "[b]y voting, the minority party voters . . . set a figure which must be matched and exceeded by opposing voters before the State's electoral vote bloc is awarded to the opponent." Id. at 627 (quoting Staff of S. Subcomm. on Const. Amends., 87th Cong., Memorandum on the Electoral College 23 (Oct. 10, 1961)). Along these lines, the applicability of the

-34-

decision in Gray, as well as other relevant "one person, one vote" cases, was directly at issue in Williams. In fact, the core equal protection holding that "the general ticket does not come within the brand of [the one person, one vote] decisions" is a direct application of Gray's principles regarding the constitutionality of the unit rule. Id. at 626. Therefore, the absence in Williams of a citation to Gray's footnote 12, in our view, does not place Appellants' case outside the "precise issues presented and necessarily decided" by the summary action. Mandel, 432 U.S. at 176.

Next, Appellants allege that Williams does not control the outcome of this case under their multimember district vote dilution theory either (i.e., that by turning the selection of Massachusetts's electors into an election for a eleven-member district, the WTA system dilutes the strength of Appellants' votes for non-majority party candidates). In support, they assert that White v. Regester, 412 U.S. 755 (1973), and Bush v. Gore, represent key doctrinal shifts in vote dilution law, which undermine the precedential force of Williams's summary order as applied to their "one person, one vote" claim. For the following reasons, this too does not persuade.

First, the comparison with White is inapposite. Appellants read White as giving "teeth to the principle that

at-large elections can violate the Fourteenth Amendment if they operate to dilute the influence of political minorities." Thus, without the benefit of cases like White, they argue, the Williams court could not have properly considered the potential for a voting system to dilute votes in an election for a multimember body. However, to characterize White as applying to the dilution of the voting strength of "political minorities" through the use of multimember districts is to misread its second holding, which stemmed from the Court's concern that "multimember districts [were] being used invidiously to cancel out or minimize the voting strength of racial groups." White, 412 U.S. at 765 (emphasis added) (citing Whitcomb v. Chavis, 403 U.S. 124 (1971)). Specifically, the court in White confronted the reapportionment plan for the Texas House of Representatives in Dallas and Bexar Counties, where African-American and Mexican-American communities had been "effectively excluded" or removed from "participation in the [political] process" in any "reliable and meaningful manner" for many years on end. Id. at 767, 769. In order "to bring [those] communit[ies] into the full stream of political life of the county and State," drawing single-member districts was "required to remedy 'the effects of past and present [racial] discrimination.'" Id. at 769. Appellants are not wrong that White, as well as the line of subsequent precedent to which they

cite,[11] developed voting rights case law with respect to the use of multimember districts; however, they stretch reason too far in characterizing those cases as forming a doctrine regarding diluting the voting strength of political minorities in general terms, when the clear focus of those cases was discrimination against racial minorities. Thus, White does not undermine the precedential force of Williams.[12]

---

[11] See, e.g., Thornburg v. Gingles, 478 U.S. 30, 47 (1986); United States v. Blaine Cty., 363 F.3d 897, 916 (9th Cir. 2004); NAACP v. Gadsden Cty. Sch. Bd., 691 F.2d 978, 983 (11th Cir. 1982); Montes v. City of Yakima, 40 F. Supp. 3d 1377, 1414 (E.D. Wash. 2014); Citizens for a Better Gretna v. City of Gretna, 636 F. Supp. 1113, 1135 (E.D. La. 1986), aff'd, 834 F.2d 496 (5th Cir. 1987), cert. denied, 492 U.S. 905 (1989).

[12] Appellants also take a related historical tack. At the time of its decision, the Williams court noted that Congress had "expressly countenanced" state-wide at-large elections of congressional representatives. 288 F. Supp. at 628. However, Appellants submit that, motivated by the fear that Southern states would utilize multimember districts to dilute the voting strength of racial minorities (as exemplified by the Texas counties in White), Congress changed the law to require that states with two or more representatives use single-member districts. See 2 U.S.C. § 2c. That change went into effect beginning with the ninety-first congress, which convened the year after Williams was decided. In our view, this does not alter the doctrinal landscape, for as the district court in the present case noted, "multimember districts are not per se unconstitutional." White, 412 U.S. at 765. In any event, the court in Williams seemed to be acutely aware of this because, in the same breath that it acknowledged congressional approval of multimember districts at the time, it cited the aforementioned amendment as to future elections. See 288 F. Supp. at 624. Moreover, what is true for the election of U.S. Representatives (a process over which Congress retains oversight per Article I, section 4), is not necessarily true for the appointment of presidential electors (a process over which, as previously discussed, Congress does not retain any oversight).

-37-

Second, turning to Bush, Appellants train their eyes on the Williams court's "reliance on the invidiousness as a prerequisite for an equal protection violation," which they argue has been "overcome by doctrinal developments." They ascribe particular meaning to the fact that in Bush, the Supreme Court found that Florida's recount procedures violated the "one person, one vote" principle because they resulted in "arbitrary and disparate treatment" of Florida citizens' votes without adding to that finding any discussion whatsoever of whether such discrimination was invidious. Thus, in Appellants' view, "[b]ecause invidiousness is not a requirement of the present challenge it follows that Williams cannot have resolved [their] challenge based on a legal standard that no longer controls." In our estimation, this misses the mark for two reasons.

First and foremost, we decline to read Bush, which expressly states that it is "limited to the present circumstances" (and fairly unique circumstances at that), 531 U.S. at 109, beyond its facts as overturning Williams, especially because it does not expressly discuss the selection of presidential electors. See Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000)("[The Supreme Court] does not normally overturn, or so dramatically limit, earlier authority sub silentio . . . .").

Next, we do not understand Bush to definitively alter

-38-

the doctrinal requirements of "one person, one vote" claims in every instance. In Bush, Florida's court-ordered recount of ballots cast in the 2000 presidential election violated the Equal Protection Clause because "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." 531 U.S. at 106. This lack of uniform "statewide standards for determining what is a legal vote" violated Florida's "obligation to avoid arbitrary and disparate treatment of the members of its electorate." Id. at 105, 110. In Bush, the absence of uniform standards indicated to the Court that there was no rhyme or reason for the arbitrary and disparate treatment of ballots, and therefore, an inquiry into invidiousness would have been out of place.

In any event, while proving the invidiousness of an election system may not always be required to establish a valid equal protection claim, the Supreme Court has factored a showing of invidiousness into the prima facie case for violations of the Equal Protection Clause in the voting rights context both before Williams and after Bush. See, e.g., Harris v. Ariz. Indep. Redistricting Comm'n, 136 S. Ct. 1301, 1307 (2016) ("[M]inor deviations from mathematical equality do not, by themselves, make out a prima facie case of invidious discrimination under the

-39-

Fourteenth Amendment . . . ." (citation and quotation marks omitted)); Dusch v. Davis, 387 U.S. 112, 116 (1967) ("[T]he constitutional test under the Equal Protection Clause is whether there is an 'invidious' discrimination."). In our view, the larger point is that "invidiousness" and "arbitrary and disparate treatment" are simply not mutually exclusive means of establishing the prima facie case for "one person, one vote" violations. The Supreme Court itself (as the district court here rightly noted) has recognized as much. See, e.g., Roman v. Sincock, 377 U.S. 695, 710 (1964) (explaining that the Equal Protection Clause requires "faithful adherence to a plan of population-based representation," and that "minor deviations" are only permissible if "free from any taint of arbitrariness or discrimination" (emphasis added)); cf. Clements v. Fashing, 457 U.S. 957, 967 (1982) ("Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution." (emphasis added)). Therefore, we do not read Bush as ushering in the sweeping change that Appellants assert would require us to put Williams aside. Accordingly, we concur with the district court that the Supreme Court's summary affirmance in Williams controls the outcome of the case at hand and compels the dismissal of Appellants' equal protection claim.

**3.**

Even if <u>Williams</u> were not binding, we would agree that Appellants still fail to state a "one person, one vote" claim as a matter of law. Appellants' equal protection claim does not withstand scrutiny because the WTA system does not deny Appellants equal participation in the political process by, for example, unevenly counting their votes or favoring or disfavoring any particular set of voters. Drawing from <u>Gray</u>, Appellants' first equal protection theory is that the WTA system severely burdens their right to an equally weighted vote by discarding their votes for president at the first step of a two-step presidential election. Appellants' second theory is that the WTA system unconstitutionally dilutes their votes even if viewed as an election for a multimember, state-level body of electors instead of the first step in a two-step presidential election.

The allegations in the complaint do not demonstrate that the WTA system "by . . . arbitrary and disparate treatment, value[s] one person's vote over that of another," <u>Bush</u>, 531 U.S. at 104-05, nor do Appellants plausibly allege that the WTA system infringes upon the right of voters "to participate on an equal footing in the election process," <u>Hadley</u>, 397 U.S. at 55. The WTA system does not treat any particular group of Massachusetts voters differently at all -- it does not inherently favor or disfavor

-41-

voters from any particular group (political or otherwise).  In Massachusetts, registered voters cast their ballot for president and vice president vis-à-vis a slate of presidential electors on Election Day.  After the polls close, Massachusetts counts the votes, according each vote equal weight, and then awards its electors to the party whose candidate wins the highest number of votes.  That the candidate who loses the popular vote is entitled to zero electors (irrespective of his or her political party) does not in our view signify that the votes for that candidate have been rendered meaningless.  It merely indicates that the tally of votes for that candidate was surpassed by the tally for the winning candidate. See, e.g., City of Mobile v. Bolden, 446 U.S. 55, 77 n.24, 79 (1980) (holding that although the Equal Protection Clause does confer a "right to participate in elections on an equal basis with other qualified voters," it "does not entail a right to have one's candidate prevail" or "guarantee[] proportional representation").

Moreover, that one political party has prevailed in the past eight election cycles (or thirty-two years) does not necessarily signify the unequal treatment of political parties either.  A fuller picture of Massachusetts electoral history suggests that the Republican Party, for example, has enjoyed periods of sustained success at the ballot box in both presidential

and gubernatorial elections (the latter overlapping with the eight election cycles decried by Appellants).

Thus, we find no difficulty completing the logical progression articulated by the Supreme Court in McPherson, where it upheld Michigan's use of the congressional district system for appointing electors against a constitutional challenge (the first of its kind). "If presidential electors are appointed by the legislatures, no discrimination is made; if they are elected in districts where each citizen has an equal right to vote, the same as any other citizen has, no discrimination is made." McPherson, 146 U.S. at 40. Likewise, if presidential electors are appointed on a WTA basis, and every citizen has an equal right to vote, no discrimination is made. Because that is plainly the case in Massachusetts, we do not disturb the ruling below on this point.

Appellants do not allege any invidiousness about the WTA system in Massachusetts either. While Appellants maintain that they need not allege invidiousness to state an equal protection claim, they nevertheless cite to historical evidence to illustrate that the origins of the WTA can be traced to the realpolitik between Republicans and Federalists in the early days of the republic. That the initial design of the WTA system may have contemplated the consolidation of electoral power in the majority party at any given time does not necessarily make it invidiously

-43-

discriminatory. The United States' system of representative democracy was built on compromises that sought to promote geographic equality by way of numerical balancing acts like the Electoral College and equal representation in the Senate. We recognize that Appellants do not challenge the "numerical inequality" that inheres in the Elector Clause vis-à-vis its interrelatedness with the Electoral College (which effectively gives highly populated states fewer electoral votes per capita than sparsely populated states). However, we note this interconnectedness as a means of rejecting the contention that the origins of the WTA system irrevocably plague it with invidiousness.

To begin, Appellants build their case on the assertion that the district court erroneously ignored Gray's second, independent holding in rejecting their analogy to the two-step system that the Supreme Court declared unconstitutional in that case. Gray involved a challenge to the Georgia Democratic Party's use of a county-unit system to conduct primaries for U.S. Senator and statewide offices, including for governor. See Gray, 372 U.S. at 370. Under Georgia's variation -- which the state legislature had actually amended during the course of the litigation -- the primary was divided into two steps with two metrics: units and votes. See id. at 372. Counties were allotted two units for the first 15,000 residents. See id. Counties then gained an additional

unit for each of the next intervals of 5,000, 10,000, and 15,000 residents, and thereafter, an additional two units for each additional interval of 30,000 residents.  See id.  To win the nomination in the first leg, a candidate needed to receive a majority of both the county units and the popular vote (with a majority of the popular vote breaking a tie in unit votes).  See id.  However, the state held a second "run-off" primary if no candidate won both the majority of the units and popular votes.  See id.  To win in the second leg, a candidate simply needed to amass the highest number of units.  See id.

Because the county-unit system "weight[ed] the rural vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties," the Supreme Court struck it down on equal protection grounds.  Id. at 379.  In terms of the Equal Protection Clause, the Court held that the transgression was geographic discrimination: residents of the smallest rural counties had a disproportionally higher number of unit votes in comparison to their population.  See id.  Thus, drawing upon the "conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments," the Court gave body to the principle of "one person, one vote."  Id. at 381.

Appellants contend that the district court understandably latched onto this aspect of the holding in <u>Gray</u> at the expense of its second holding, which in Appellants' view, is of greater relevance to the outcome of their case. Footnote 12 of <u>Gray</u> states:

> The county unit system, even in its amended form . . . would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of the votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.

<u>Id.</u> at 381 n.12. To confirm the weight of the footnote, Appellants cite to the Supreme Court's statement in <u>Gordon</u> v. <u>Lance</u>, that "in <u>Gray</u> . . . we h[e]ld that the county-unit system would have been defective even if unit votes were allocated strictly in proportion to population." 403 U.S. 1, 4 (1971).

Although the analogy between Georgia's county-unit system and the WTA system has intuitive appeal, <u>Gray</u> does not in our view give wings to Appellants' claim. We do not understand footnote 12 to invalidate the use of the unit rule in the context of selecting presidential electors. After all, the Court in <u>Gray</u> was careful to offer something of a disclaimer that "analogies to the electoral college . . . and to other phases of the problems of representation in state or federal legislatures or conventions are

-46-

inapposite." 372 U.S. at 378 (emphasis added) (footnote omitted). Appellants implicitly hang their hats on the Court's subsequent comment that the Constitution's "validat[ion]" of the "inherent numerical inequality" in the Electoral College "implied nothing about the use of an analogous system by a State in a statewide election." Id. But that is precisely what separates Georgia's use of a county unit system in a statewide primary election from Massachusetts's use of the WTA system in the presidential election.

Whatever the added effect of footnote 12, the core concern in Gray was that the county-unit system perpetuated a form of geographic discrimination within the state of Georgia that magnified the voice of rural voters.[13] In other words, the equal protection violation stemmed from the observation that every voter in the Democratic primary was not "equal to every other voter in his State." Id. at 380. Moreover, even in recognizing the point raised in footnote 12 that Georgia's county unit system "would have been defective even if unit votes were allocated strictly in proportion to population," Gordon -- the case to which Appellants cite -- noted that the "defect" to which footnote 12 referred

---

[13] Although not explicitly phrased in such terms, the underlying concern before the Court in Gray was that the geographic discrimination in Georgia was particularly invidious because the favored rural counties had significantly lower populations of racial minorities than urban counties.

"continued to be geographic discrimination."  403 U.S. at 4-5.

This confirms that the discarding of the votes was never the core

focus of the holding.  Rather, it was the disparate treatment that

ran afoul of the Fourteenth Amendment because the "[v]otes for the

losing candidates," as Georgia weighed them, "were discarded

solely because of the county where [they] were cast."  Id. at 5.

The same cannot be said of votes for losing candidates in

Massachusetts.

Massachusetts's WTA system is not materially analogous

because the role of counties in Georgia and the role of states

under the federal Constitution materially differ.  Counties qua

counties in Georgia did not have the power to select Georgia's

governor.  Rather, the voters chose the governor by ballot; hence

any attempt to use "two steps" to weight those votes differently

raised equal protection issues.  States, by contrast, have the

power to select the electors who vote for president.  And under

the Constitution, a state can decide for itself, without any

plebiscite, whether to cast its full support behind a single

candidate.  Massachusetts decided to do so.  That left only a

single decision for voters: which candidate?  On that decision,

Massachusetts chose to turn to its voters, conducting a single,

one-step electoral process just as it does to select a governor.

In short, on the question assigned to voters in Massachusetts,

-48-

there is only a one-step vote, with no dilution.

Moreover, the Constitution directly addresses this issue in a manner that shows no inkling of requiring a plebiscite. For instance, in the event that the electoral vote is not decisive, the vote goes to the House of Representatives to break the tie in the Electoral College, with each state having one, winner-take-all vote. See U.S. Const. amend. XII ("[I]n choosing the President, the votes shall be taken by states, the representation from each state having one vote . . . ."). Furthermore, the very use of electoral votes itself rejects "one person, one vote" as a requirement in the selection of electors unless one contends that electoral votes need be subdivided into fractions. Thus, in Vermont, for example, even under Appellants' proposed method of voting, there will be "unequal" votes unless a candidate gets exactly zero or one third of the votes with the remainder all to the other.

Accordingly, Appellants' two-step theory does not hold weight even factoring in the contents of footnote 12 in Gray.

Moving to Appellants' second equal protection theory asserting vote dilution in a multimember district of electors, we find that it too fails to carry the day. Appellants contend that even if viewed as a single-step election for a slate of electors, the WTA system severely burdens their Fourteenth Amendment rights

"by canceling out their votes for Electors through an at-large . . . election that systematically ensures zero representation in Massachusetts' Electoral College delegation."

Their argument is premised on the original intent that the Electoral College would function as a deliberative body. See McPherson, 146 U.S. at 36 ("[I]t was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the chief executive, but . . . . the original expectation may be said to have been frustrated."). By this logic, Massachusetts denies equal representation to the citizens who vote for minority party candidates because the WTA system ensures that they will not be represented by any electors in the Electoral College. Appellants thus argue, relying on Burns, 384 U.S. at 88, that the WTA system "'cancel[s] out the voting strength' of minority voters in order to consolidate power in the hands of the plurality."

There is no question that multimember apportionment schemes can violate the dictates of the Equal Protection Clause if (by design or impact) they dilute the voting strength of "political elements of the voting population." Burns, 384 U.S. at 88; see also Allen, 393 U.S. at 569.[14] However, the use of a WTA system

_____

[14] Functionally, multimember districts are those in which the people elect multiple candidates to represent a single consolidated district based on a plurality voting system.

-50-

does not necessarily render a multimember apportionment scheme unconstitutional.  In Whitcomb v. Chavis, for example, the Supreme Court considered an equal protection challenge to Indiana's use of multimember districts for its state general assembly elections amidst criticism of, inter alia, "their winner-take-all aspects." 403 U.S. at 158-59.  However, the Supreme Court ultimately rejected the argument that use of such multimember districts, which were decided by plurality vote, violated the Equal Protection Clause "simply because the supporters of losing candidates have no legislative seats assigned to them."  Id. at 160; see also id. at 154-55 ("The mere fact that one interest group . . . has found itself outvoted and without legislative seats . . . provides no basis for invoking constitutional remedies where . . . there is no indication that this segment of the population is being denied access to the political system.").

We see a useful parallel to the impact of the WTA system in Massachusetts.  If the WTA system could indeed be characterized as a multimember district -- which we are not certain that it can, given the largely ministerial role of electors today -- voters for minority candidates do not suffer a violation of their equal protection rights simply because their preferred candidate did not

---

See Whitcomb, 403 U.S. at 134 n.11, 160.

prevail after having an equal and fair opportunity to compete in the statewide election. Thus, while Appellants are "[a]rguably . . . without representation since the [candidates] they voted for have been defeated," that is the nature of the "head-on races between candidates of two or more parties" that defines "typical American legislative elections." Id. at 153. In that sense, the WTA system is no different from any other election system decided by plurality voting. We do not say that votes cast for the losing candidate in any other such election are discarded because the winner belongs to a different political party or because those who voted for the losing candidate disapprove of the winner's political agenda. Thus, to the extent that Appellants challenge the validity of plurality voting in general through their equal protection claim, they do not prevail.

Whitcomb, of course, recognizes that multimember districts "may be subject to challenge" under certain circumstances of vote dilution. Id. at 143 (citing Fortson, 379 U.S. at 439). The Court added to its holding that the "tendency" of a multimember district to have such an effect "is enhanced when the district is large and elects a substantial proportion of the seats in either house of a bicameral legislature . . . or if it lacks provision for at-large candidates running from particular geographical subdistricts." Id. at 143-44 (citing Burns, 384 U.S.

at 88). Appellants submit that the use of the WTA system in Massachusetts aptly illustrates the "dilutive characteristics" that were absent in Whitcomb. Under their analogy, Massachusetts's unicameral body of eleven electors is the "district," and since one hundred percent ("a substantial proportion") of "the seats," or electors, are awarded to the party whose candidate wins the popular vote, the dilutive effect is at its peak. However, this parallel is based on a strained reading of the holding in Whitcomb, which stands for the proposition that multimember districts only prompt equal protection claims when "conceived or operated as purposeful devices to further racial . . . discrimination." Whitcomb, 403 U.S. at 160 (emphasis added). And as we have explained, Appellants do not allege such invidiousness behind the WTA system in Massachusetts.

Additionally, Appellants hypothesize that since it would be unconstitutional for Massachusetts to provide for the election of its state senators using a single-slate, at-large WTA election (because it would result in single-party rule), it is therefore unconstitutional to adopt the WTA system to appoint Massachusetts's slate of electors. This analogy does not quite pan out, as presidential electors are not a comparable body of representatives, especially now that the Electoral College has effectively lost its deliberative character.

-53-

Finally, as previously explained, any comparison to White is inapposite. While "political elements" are certainly a protected class in the voting rights context, White was concerned with an altogether different form of deep-seeded exclusion of racial minorities from equal participation in the political process that extended temporally far beyond the eight election cycles to which Appellants point in their complaint. Therefore, Appellants do not adequately state a claim under a multimember district theory either.

Accordingly, we affirm the district court's ruling that Appellants have failed to state a "one person, one vote" equal protection claim.

## C. Associational Rights Claim

We turn our attention to whether Appellants' allegations plausibly support a claim that the WTA system violates their associational rights under the First and Fourteenth Amendments. At the core, Appellants allege that the Massachusetts WTA system severely (and unconstitutionally) burdens their associational rights by "discarding" or "diluting" their votes as minority party members in a manner that ensures that they get no voice in the Electoral College. Because the right to freedom of association does not entitle citizens to electoral success, we agree with the

district court that Appellants' complaint does not allege an associational burden.

Together, the First and Fourteenth Amendment operate to protect "[t]he freedom of association." Tashjian v. Republican Party of Conn., 479 U.S. 208, 214 (1986); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). This protection includes the rights of citizens to "form political parties for the advancement of common political goals and ideas" as well as the rights of parties to self-determine their organizational structure and to select candidates. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357, 363 (1997); see also Cal. Democratic Party v. Jones, 530 U.S. 567, 574-75 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); Tashjian, 479 U.S. at 214-15. To that end, because voters express their preferences at the ballot box, see Anderson, 460 U.S. at 787-88, associational freedom necessarily includes "the right to cast an effective vote." Republican Party of N.C. v. Martin, 980 F.2d 943, 960 (4th Cir.

-55-

1992); cf. Rhodes, 393 U.S. at 30 (noting the overlap between "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively" in the context of an equal protection challenge).

No bright line rule exists to aid our inquiry. Instead, to decide whether a state election law violates the aforementioned associational rights, we employ a balancing test that weighs the "'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and [then] consider the extent to which the State's concerns make the burden necessary." Timmons, 520 U.S. at 358 (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)). We apply strict scrutiny to a state election law that severely burdens a plaintiff's associational rights, meaning that it must be "narrowly tailored and advance a compelling state interest." Id. By contrast, "[l]esser burdens . . . trigger less exacting review." Id.; see Anderson, 460 U.S. at 788 ("[T]he state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.").[15]

---

[15] Because (as we will explain) we have determined that there is no burden at all to Appellants' associational rights, we need not decide between the various tiers of scrutiny.

We proceed to Appellants' claim that the WTA system burdens their associational rights because it "ensur[es] that [their] votes, and any associational efforts, can have no effect on the national election." First and foremost, we echo the district court's determination that the WTA system simply does not burden Appellants' associational rights because it merely "sets the stakes" but "does not help or hurt one group's chances of winning the Commonwealth's electors." Lyman, 352 F. Supp. 3d at 91. That one's candidate of choice does not prevail at the ballot box simply does not translate into an associational rights violation. See Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 464-65 (1979) ("The First Amendment right to associate and to advocate 'provides no guarantee that a speech will persuade or that advocacy will be effective.'" (quoting Hanover Twp. Fed'n of Teachers v. Hanover Cmty. Sch. Corp., 457 F.2d 456, 461 (1972))); Martin, 980 F.2d at 960 ("The First Amendment guarantees the right to participate in the political process. It does not guarantee political success."). The fact that the loser of the popular vote is not entitled to electors does not make that candidate's voters "unequal participant[s] in the decisions of the body politic." Complaint at 14, Lyman v. Baker, 352 F. Supp. 3d 81 (D. Mass. 2018) (No. 1:18-cv-10327) (quoting Whitford v. Gill, 218 F. Supp. 3d 837, 883 (W.D. Wis. 2016)). It is thus no burden

-57-

to Appellants' right of "partisan political organization" that their candidates of choice are not entitled to any of Massachusetts's electors even if they only lose the general ticket by a margin of a single vote. Tashjian, 479 U.S. at 214.

Elections are hard-fought political battles won by the power of persuasion. See Schatz, 669 F.3d at 52 (observing that the electoral process "sometimes has the feel of a contact sport, with candidates, political organizations, and others trading rhetorical jabs and sound-bite attacks in hopes of landing a knockout blow at the polls"). The WTA system raises the stakes of victory, but it does not deprive any group of Massachusetts voters of "an equal opportunity to win votes" during the statewide election. Rhodes, 393 U.S. at 31. It would be troublesome indeed if, like Ohio's ballot access measure in Rhodes, Massachusetts's WTA system imposed signature requirements that made it "virtually impossible" for a political party to slot their candidate onto the statewide ballot. Id. at 24-25. That, however, is not the case in Massachusetts, which offers the candidates whom Appellants support the "equal opportunity to win votes." Rhodes, 393 U.S. at 31. Indeed, Appellants cannot and have not alleged that the WTA system restricts their ability to express their political preferences in Massachusetts by keeping their preferred candidates off the ballot. See Anderson, 460 U.S. at 786-88. Appellants'

preferred candidates did appear on the ballot in the 2016 presidential election and Appellants allege that they exercised their right to vote (the alleged harm being that their votes were effectively "discarded" by virtue of the WTA system).

Instead, Appellants assert that the WTA system has the effect of "distorting the political process" in such a manner that severely burdens their associational rights because it "incentivizes candidates to ignore Massachusetts . . . and its [political] minority voters in each election cycle," which in turn exposes the national election system to foreign interference as well.  Having contextualized Massachusetts's use of the WTA system vis-à-vis the Electoral College as being in line with the national norm, it would not be sensible now to deem it the culprit for the outsized influence that a handful of swing states exert on the presidential election (whether because of the date of their primary elections or the opportunity they offer to capture electoral votes).  We cannot opine here on the policy arguments for and against this intersection between the WTA system and the Electoral College.  Moreover, Appellants do not allege that the WTA system burdens the associational rights of the political parties to which they belong to determine their organizational structure, engage in political activities, or select their leaders (in Massachusetts). See Timmons, 520 U.S. at 357-58.

Lastly, we note that in the course of its analysis, the district court turned to the Supreme Court's gerrymandering jurisprudence because it sheds some light on how to assess the "character and magnitude" of the burden imposed by state election law on associational freedoms.[16] For these purposes, it is particularly troubling "when a State purposely 'subject[s] a group of voters or their party to disfavored treatment.'" Gill, 138 S. Ct. at 1938 (Kagan, J., concurring) (emphasis added) (alteration in original) (quoting Vieth, 541 U.S. at 314 (Kennedy, J., concurring)).

Appellants contend that the district court incorrectly dismissed their claim on the basis that the WTA system does not purposely burden their associational rights by reason of their views. The Commonwealth, for its part, suggests that the district court drew the parallel to gerrymandering as a means of "observing that the winner-take-all system is a neutral rule, the application of which does not turn on the viewpoint of a particular individual, group, or party." While intent (i.e., purpose) may not be a

---

[16] We also note the potential limitations of this comparison after Rucho v. Common Cause, in which the Supreme Court held partisan gerrymandering to be a non-justiciable political question (at least in the context of plaintiffs' equal protection and First Amendment claims). 139 S. Ct. 2484, 2498-2502, 2504-05 (2019). By contrast, Elector Clause claims are justiciable. See McPherson, 146 U.S. at 23-25.

required element of an associational rights claim, we tend to agree with the Commonwealth that the larger point is that the WTA system is a rule of neutral and even-handed application that does not burden the associational rights of any voter or party by reason of their views.

Therefore, Appellants have not sufficiently alleged that the WTA system burdens their associational freedom. Even if we were pressed to find that some burden resulted, it is surely not severe, and its "character and magnitude" is too slight to exert any significant force in the relevant balancing test that cannot be overcome by any regulatory interest of Massachusetts.

### III.

In conclusion, even though Appellants do have standing to bring their claims, we agree with the district court that they have failed to state a claim for relief for Rule 12(b)(6) purposes under either of their constitutional theories. Accordingly, we affirm the district court's dismissal of both claims.

**Affirmed**.