# United States Court of Appeals
## For the First Circuit

No. 21-1453

CALVARY CHAPEL OF BANGOR,

Plaintiff, Appellant,

v.

JANET MILLS, in her official capacity
as Governor of the State of Maine,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lynch and Thompson, Circuit Judges.

---

Mathew D. Staver, with whom Horatio G. Mihet, Roger K. Gannam, Daniel J. Schmid, and Liberty Counsel were on brief, for appellant.
Sarah A. Forster, Assistant Attorney General, with whom Aaron M. Frey, Attorney General, and Christopher C. Taub, Chief Deputy Attorney General, were on brief, for appellee.

---

October 31, 2022

---

**THOMPSON**, **Circuit Judge**.  COVID-19 cases often force courts to decide difficult questions about how states use their powers against others.  Not so here, however.  The case is moot, as our *de novo* review of the matter shows, see Bos. Bit Labs, Inc. v. Baker ("Bos. Bit Labs"), 11 F.4th 3, 8 (1st Cir. 2021) — and no mootness exception can save it.

## I

The parties — Calvary Chapel of Bangor ("Calvary") on one side, Maine Governor Janet Mills ("the Governor") on the other — do not really dispute the basic background events.

## A

After the outbreak of COVID-19 in early 2020, the Governor declared a state of emergency.  And invoking her emergency powers, she penned a series of orders to help slow the virus's spread (fyi, she issued proclamations renewing the state of emergency every 30 days — until, as we will see, the state of emergency ended in June 2021).  We summarize the most salient of these.

Executive Order 14 FY 19/20, issued March 18, banned "[g]atherings of more than 10 people" for any "social, personal, [or] discretionary events" — including, for example, "community, civic, public, leisure, and *faith-based* events" (emphasis ours).

Issued March 24, Executive Order 19 FY 19/20 allowed "[e]ssential [b]usinesses and [o]perations" — "pharmacy and other medical, psychiatric, and long-term care facilities," "grocery and household goods," and "gas stations and laundromats" are just a few examples — to go beyond the 10-person-gathering cap, subject to social distancing and sanitation guidelines. "Non-essential businesses" — among them "shopping malls, theaters, casinos, fitness and exercise gyms" — could do limited activities that "d[id] not allow customer, vendor or other visitor in-person contact," "d[id] not require more than 10 workers to convene in space where social distancing is not possible," and "[were] facilitated to the maximum extent practicable by employees working remotely." Of importance here, the exemption for "essential businesses" did not (to quote Calvary's complaint) apply to "faith-based gatherings of more than 10 people."

Executive Order 28 FY 19/20, issued March 31, instructed "[a]ll persons" residing in Maine "to stay at their homes or places of residence," except as needed "[t]o conduct or participate in [e]ssential" employment or activities. This exception covered activities considered critical to public "health and safety," like "accessing child care, seeking medical or behavioral health or emergency services," visiting "[f]ood [b]anks and [f]ood [p]antries," and shopping for "household" necessities. The order

- 3 -

also set customer limits based on the facilities' square footage — 5 people for buildings less than 7,500 square feet, 15 people for buildings between 7,500 and 25,000 square feet, 50 people for buildings between 25,000 and 50,000 square feet, 75 people for buildings between 50,000 and 75,000 square feet, and 100 people for buildings more than 75,000 square feet. Also of importance here, "[t]he exemption allowing 'essential' businesses to operate subject to numerical limitations" (to again quote Calvary's complaint) "was not applicable to faith-based gatherings or churches, regardless of the size of the building in which such worship services take place."[1]

Issued April 29, Executive Order 49 FY 19/20 directed Maine's department of economic and community development to implement a four-stage plan to re-open the economy — "identify[ing] businesses and activities where current restrictions may be adjusted" and granting "conditional approval consistent with" the plan, though acknowledging that "[a]ny such approval is . . . subject to suspension or revocation depending upon actual and

_____

[1] Back to food banks and pantries for a minute. Calvary's brief tells us that the Governor's orders let Calvary's pastor, members, and volunteers "travel to and from their homes to Calvary['s] . . . facility . . . to provide food for those in need of food, shelter, [and] counseling" but barred Calvary "from offering" in the "same church building" the kind of "religious worship services" necessary for congregants to celebrate their faith (bold type omitted).

- 4 -

consistent compliance with such conditions." Noting how the "tireless efforts and decisive action by people across Maine" seemed "to be flattening the curve against COVID-19," the plan (we offer a few highlights) discarded the "essential v. non-essential" labels and eased past restrictions. Envisioning a 10-person-gathering limit, stage 1 (to start May 2020) allowed the re-opening of certain businesses under industry-specific checklist standards. Stage 1 anticipated "[l]imited drive-in, stay-in-your-vehicle church services." Stage 2 (to start June 2020) contemplated a 50-person-gathering limit and more businesses that could re-open. Stage 3 (to start July or August 2020) foresaw keeping the 50-person-gathering limit but allowing more businesses to re-open. And stage 4 (to start at a date to be determined) expected "[a]ll businesses" to re-open. The plan did say, though, that "[i]f the COVID-19 situation worsens in Maine for any reason, the state will move quickly to either halt progress or return to an earlier stage."

Consistent with past practice, "we refer to this quartet of executive orders as the 'gathering orders' and to the April 29 order as promulgating 'the re-opening plan.'" See Calvary Chapel of Bangor v. Mills ("Calvary I"), 984 F.3d 21, 26 (1st Cir. 2020), cert. denied, 142 S. Ct. 71 (2021).

**B**

Not long after in early May 2020, Calvary sued the Governor in federal court. Simplifying slightly, the complaint — raising many facial and as-applied constitutional and statutory challenges — essentially claimed that the gathering orders discriminated against Calvary by "prohibit[ing]" Calvary "from hosting its in-person religious worship services" while letting "businesses" run "without the onerous restrictions imposed on Calvary." And the complaint (as relevant here) requested a temporary restraining order, a preliminary injunction, a permanent injunction, and a declaratory judgment.[2]

On the same day it filed the complaint, Calvary moved for a temporary restraining order and ultimately a preliminary

---

[2] As Calvary I helpfully explained, the complaint alleged

> violations of the Free Exercise Clause of the First Amendment (Count I); the First Amendment right to peaceful assembly (Count II); the Free Speech Clause of the First Amendment (Count III); the Establishment Clause of the First Amendment (Count IV); the Equal Protection Clause of the Fourteenth Amendment (Count V); the Guarantee Clause of Article IV (Count VI); the Maine Constitution's guarantee of free exercise of religion (Count VII); the Maine Constitution's freedom of speech guarantee (Count VIII); legislative prerogatives (Count IX); and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc-2000cc-5 (Count X).

See 984 F.3d at 26 n.1.

- 6 -

injunction.  The district judge, however, denied Calvary's bid for a temporary restraining order.  Rather than pushing for a hearing on its preliminary-injunction request, Calvary immediately appealed.  But we later dismissed that appeal for lack of jurisdiction.  See id. at 25.

## C

Meanwhile, the Governor issued more executive orders in late spring and early fall of 2020.  Of note are these.

Issued on May 29, Executive Order 55 FY 19/20 upped the gathering limit from 10 to 50 effective June 1.

Executive Order 14 FY 20/21, issued October 6, set the indoor-gathering limit for "establishments that provide and require seating for all invitees" at "50% of the facility's permitted occupancy limit or 100 persons, whichever is less."  For establishments that neither provide nor require seating, the order put the indoor-gathering limit at 50.  "Establishments" included "houses of worship," the order read.  And the order stated that "Maine is now positioned to implement" the final stage of the re-opening plan.

Issued November 4, Executive Order 16 FY 20/21 — after mentioning "the upward trajectory" of Maine's COVID-19 "cases, hospitalizations, and positivity rates" — returned the indoor-gathering limit to 50.

**D**

The filings in the district court became a paper blizzard, starting in February 2021. Without attempting to cover everything the parties argued, we discuss the following.

On February 9, the Governor asked the judge to dismiss Calvary's lawsuit. Reading Calvary's complaint as only contesting the 10-person-gathering limit, the Governor called the suit moot mainly because Executive Order 55 FY 19/20 had raised the limit to 50 roughly nine months earlier. Three days later, on February 12, the Governor issued Executive Order 31 FY 20/21, which increased "[t]he indoor gathering limit" for — and *only for* — "houses of worship" to "5 persons per 1,000 square feet of functionally available space, or 50 persons, whichever is greater." Within a week after that, on February 18, Calvary moved the judge for a preliminary injunction to stop the Governor from "enforcing her unconstitutional and discriminatory COVID-19 restrictions on Calvary['s] . . . religious worship services."

This brings us to March 2021. Opposing the Governor's dismissal motion, Calvary's March 5 filing insisted that the complaint challenged **"the entire regime"** as it exists "today" — which, Calvary continued, meant that its claims were "not moot" (bold type in original). Alternatively, Calvary argued that two related exceptions to mootness — "voluntary cessation" and actions

- 8 -

"capable of repetition yet evading review" (more on these shortly) — applied. That same day, the Governor issued Executive Order 35 FY 20/21, which — effective March 26 — increased "[i]ndoor gathering limits and in-store limits" to the greater of "50% of permitted occupancy, 5 persons per 1,000 sq. ft., or 50 persons." The Governor (to quote the order) took that step based on expert advice driven by "new information and the best available science."

To no one's surprise, the Governor opposed Calvary's preliminary-injunction request. According to her March 15 filing, because she had "rescinded" the 10-person-gathering limit "nearly nine months ago," no live controversy persisted. And stating that she "had announced her intent to increase the gathering limit before Calvary filed this lawsuit" and that "there is no reasonable expectation that the challenged conduct will reoccur," the Governor saw no way around mootness.

The parties exchanged replies and sur-replies.

**E**

With spring 2021 in full swing, the Governor issued Executive Order 38 FY 20/21 on May 13. This order jettisoned all "[i]ndoor gathering limits and in-store customer limits" — a result (to quote that order) also driven by expert advice tied to "decreasing COVID-19 case counts and positivity rates, and increasing rates of vaccination in Maine and nationally," which

made such limits "no longer necessary to protect the public health."

The very next month, on June 4, the judge ruled on the parties' motions. "None of the restrictions imposed by the gathering orders is in effect today," the judge wrote (capitalization removed). And, in the judge's words, even reading Calvary's complaint as contesting "any restriction that allegedly treated religious gatherings less favorably than certain businesses or secular gatherings" would not change the outcome. That was because "[r]eligious gatherings have not been subject to such treatment for nearly four months" (*i.e.*, since February 2021). The judge also found no mootness exception helped Calvary, for two related reasons — the Governor showed "that it is absolutely clear that [she] cannot reasonably be expected to reinstate" the challenged orders and "there [was] no 'reasonable expectation'" that the Governor would subject Calvary to the same restrictions. And so the judge granted the Governor's dismissal motion, denied Calvary's preliminary-injunction bids, and entered a separate judgment dismissing Calvary's complaint.

Calvary filed a notice of appeal that very day, on June 4. A few weeks later, on June 30, the Governor's final order renewing the state of emergency expired — thus ending the state of emergency (which makes it strange that Calvary's opening brief

here says that even "now," *i.e.*, "up to the present," it cannot have "more than 50 people" at its religious services).

**F**

This is as good a place as any to recap the "regime" (Calvary's word) of restrictions that supposedly treated religious gatherings less favorably than other gatherings. First put in place in March 2020, all gathering restrictions ended in May 2021. The state of emergency — under which the Governor imposed the restrictions — ended in June 2021. And the Governor has not since either reinstated the state of emergency or imposed new restrictions of the type challenged here.

**II**

Time for our say on this.

**A**

Federal judges can decide only "Cases" or "Controversies" between adversaries. See U.S. Const. art. III, § 2. That means we decide only "live" disputes, not "moot" ones. See, e.g., Bos. Bit Labs, 11 F.4th at 8. And this limitation applies "at all stages of review, not merely at the time the complaint is filed." See Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 67 (1997) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)); see also TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021) (declaring that "[f]ederal courts do not possess a roving

- 11 -

commission to publicly opine on every legal question").  A suit remains viable if "the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)."  See Bos. Bit Labs, 11 F.4th at 8 (quoting Air Line Pilots Ass'n, Int'l v. UAL Corp., 897 F.2d 1394, 1396 (7th Cir. 1990) (Posner, J., for the panel)); see also Aetna Life Ins. v. Haworth, 300 U.S. 227, 241 (1937) (commenting that federal courts may resolve only "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts").  So even if a suit presented a live dispute when filed, if events change "such that . . . the complaining party winds up with all the relief the federal court could have given [it]," the case is "moot" and must be dismissed.  See Bos. Bit Labs, 11 F.4th at 8 n.3 (quoting Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1250 (10th Cir. 2009) (Gorsuch, J., for the panel) (quotations and citation omitted)).

But as with most rules, exceptions exist.  And two are relevant here.  One is the "voluntary cessation" exception.  The other is the "capable of repetition yet evading review" exception.  We give a quick tutorial on each.

- 12 -

The first exception — voluntary cessation — holds that a defendant's voluntary change in conduct moots a case only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc. ("Friends"), 528 U.S. 167, 189 (2000) (quotations omitted). Otherwise "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [she] left off, repeating the cycle until [she] achieves all [her] unlawful ends." See Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013); accord Bos. Bit Labs, 11 F.4th at 10. But this exception "'does *not* apply' if the change in conduct is '*unrelated* to the litigation.'" See Bos. Bit Labs, 11 F.4th at 10 (quoting Town of Portsmouth v. Lewis ("Lewis"), 813 F.3d 54, 59 (1st Cir. 2016)).[3]

The second exception — capable of repetition yet evading review — applies only if "(1) the challenged action [is] in its duration too short to be fully litigated [before] its cessation or

---

[3] Calvary tries at one point to misquote away the test, saying that the Governor "must make it **'absolutely clear'** that the conduct will not recur" and then saying that she must "mak[e] the concrete commitment that she will not return to her old ways" (emphasis Calvary's). Contrary to Calvary's mischaracterization, the test is — as we said — whether it is "absolutely clear that the allegedly wrongful behavior could not *reasonably be expected* to recur." See Friends, 528 U.S. at 189 (emphasis ours). That Calvary bases its "concrete commitment" claim on the wrong test sinks that contention.

- 13 -

expiration, *and* (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."  See Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam) (emphasis added); accord Harris v. Univ. of Mass. Lowell, 43 F.4th 187, 194 (1st Cir. 2022).  Though often invoked, this exception operates only in extraordinary situations.  See Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 170 (2016).

To wrap up the schooling, the burden of showing mootness is on the defendant.  See Bos. Bit Labs, 11 F.4th at 8.  So is "the burden of showing that the voluntary-cessation [exception] does *not* apply."  See id. at 10 (citing Friends, 528 U.S. at 190).  But the burden of showing that the capable-of-repetition exception *does* apply is on the plaintiff.  See Harris, 43 F.4th at 194.

**B**

Bowing to reality, Calvary conceded at oral argument here that the Governor has ended Maine's gathering restrictions *and* Maine's state of emergency.[4]  But as Calvary sees things, with

---

[4] Curiously (as intimated above), Calvary's opening brief never mentions that the state of emergency wound down.  Calvary's reply brief does mention it, calling it a "temporar[y]" ending.  But labeling something "temporar[y]" does not make it so.  See generally Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 20 (1st Cir. 1999) (expressing the truism that statements by lawyers in their briefs are not evidence).

the Governor's defense of the restrictions, the case is not moot under the voluntary-cessation and the capable-of-repetition exceptions. That, though, is not how we see things.[5]

**1**

Beginning with the voluntary-cessation exception, we find for many reasons that the Governor has made it absolutely clear that she cannot reasonably be expected to revert to her prior behavior. But it suffices to focus on the following dispositive ones.

For starters, and to borrow phrasing from a recent sibling circuit opinion, "any future" COVID-19 restriction "likely would not present substantially the same legal controversy as the one originally presented here" because "[t]he Supreme Court and other courts have since blocked any number of [restrictions], thereby providing concrete examples of mandates and restrictions that violate the Free Exercise Clause." See <u>Resurrection Sch.</u> v.

---

[5] The Governor describes Calvary's complaint as focusing only on the 10-person-gathering restriction — Calvary, for example (and to quote the Governor's brief), "never amended its complaint to challenge the 50-person limit, which was in effect for over eight months." That description does not sit well with Calvary, which claims its complaint focuses on the reinstatement of *any* of the Governor's "old restrictions" that treat religious gatherings less favorably than other secular gatherings. In law as in life, "the simplest approach" is often "best." See <u>United States</u> v. <u>Cruz-Ramos</u>, 987 F.3d 27, 39 (1st Cir. 2021). And that is true here: we can assume Calvary's account is correct because it does not affect the result.

- 15 -

<u>Hertel</u>, 35 F.4th 524, 529 (6th Cir. 2022) (en banc), <u>petition for cert. filed</u>, (U.S. Aug. 23, 2022) (No. 22-181).  And given the record, we see no reasonable likelihood that the Governor would — as Calvary implies — ignore binding COVID-19-related "pronouncements on equal treatment between religious exercise and comparable secular activity."  <u>See</u> <u>Hawse</u> v. <u>Page</u>, 7 F.4th 685, 693 (9th Cir. 2021).

Also critically, the governor has made it absolutely clear through her actions that she did not *ease* and then *end* the contested restrictions only to reimpose them once this litigation is over — a conclusion based on the undisputed pattern of events shown in the record.  Remember how she boosted the "[i]ndoor gathering limits" in March 2021 — to the greater of "50% of permitted occupancy, 5 persons per 1,000 sq. ft., or 50 persons — because of expert advice based on "new information and the best available science."  Remember too how she eliminated all gathering restrictions in May 2021 because of expert advice based on "decreasing COVID-19 case counts and positivity rates, and increasing rates of vaccination in Maine and nationally," which altogether made these restrictions "no longer necessary to protect the public health."  Remember as well how when she ended the state of emergency in June 2021, the judge had *already dismissed*

Calvary's suit.[6]  So not to put too fine a point on it, but we see no hint that the Governor will "pick up where [she] left off" if the case is declared moot.  See Already, LLC, 568 U.S. at 91.  Far from it, for the Governor has shown that she changed course for reasons unrelated to the litigation.  See Bos. Bit Labs, 11 F.4th at 10 (suggesting that events showed that the Governor changed COVID-19 restrictions not to game the judicial system "but in response to the progress made in battling the pandemic").[7]

And Calvary's top argument for why the judge erred in not applying the voluntary-cessation exception does not move the needle in its direction.  A persistent theme in Calvary's briefs is that the suit cannot be moot because "the Governor retains the

---

[6] Allow us to say again — because it bears repeating — that all of the just-made points in the three sentences beginning with "Remember" are uncontested.

[7] Hurting Calvary as well is a declaration by the Governor's legal counsel written *before* the state of emergency ended (which both parties mention).  This declaration said that it is "highly unlikely that the Governor will ever reimpose the 10-person limit on gatherings . . ., at least with respect to religious gatherings" — noting vaccine advances, increased vaccination rates, greater knowledge of COVID-19, and recent Supreme Court caselaw in this area.  All of which bolsters our changes-unrelated-to-litigation conclusion.  Calvary thinks differently, stating that "[t]he Governor does not make it 'absolutely clear' that she will not return to her old ways."  But Calvary's fixation on the "absolutely clear" lingo misstates the test, as we have already explained in footnote 3.  Again, the test is whether it is "absolutely clear that the allegedly wrongful behavior could not *reasonably be expected* to recur."  See Friends, 528 U.S. at 189 (emphasis ours).  And Calvary does not grapple with the italicized language here.

- 17 -

authority to reinstate her restrictions at any time" — meaning, the argument continues, Calvary faces a constant threat that she will use that power to restore restrictions that (allegedly) discriminate against religious services compared with other secular activities. But this retain-authority contention is essentially a rehash of an argument rejected in Bos. Bit Labs, which held:

> That the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot. And we know some are.

See 11 F.4th at 10 (first citing N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y., 140 S. Ct. 1525, 1526 (2020) (per curiam), and then citing N.E. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 18 (1st Cir. 2002)).

Calvary's cases do not change our thinking either. See generally Bos. Bit Labs, 11 F.4th at 10 (noting that application of the voluntary-cessation exception "turns on the *circumstances of the particular case*" (emphasis added)). Take Roman Cath. Diocese of Brooklyn v. Cuomo ("Roman Cath. Diocese"), 141 S. Ct. 63 (2020) (per curiam), S. Bay United Pentecostal Church v. Newsom, 141 S. Ct. 716 (2021) (mem.), Harvest Rock Church, Inc. v. Newsom, 141 S. Ct. 1289 (2021) (mem.), and Tandon v. Newsom, 141 S. Ct. 1294 (2021) (per curiam) — four Supreme Court cases that granted

- 18 -

injunctions pending appeal of certain COVID-19 restrictions. Unlike in those cases, the state of emergency is no longer in place and the questioned restrictions have gone by the boards. Ditto for Bayley's Campground, Inc. v. Mills, 985 F.3d 153 (1st Cir. 2021), a pandemic-related case of ours that Calvary discusses. The state of emergency's ending is also a key difference between this case and the out-of-circuit decisions Calvary cites — Agudath Isr. of Am. v. Cuomo, 983 F.3d 620 (2d Cir. 2020), Calvary Chapel Dayton Valley v. Sisolak, 982 F.3d 1228 (9th Cir. 2020), Calvary Chapel Lone Mt. v. Sisolak, 831 F. App'x 317 (9th Cir. 2020) (mem.), and Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341 (7th Cir. 2020), cert. denied, 141 S. Ct. 1753 (2021). And unfortunately for Calvary, these differences distinguish away the significance of those cases. See Bos. Bit Labs, 11 F.4th at 11 (making a similar point in a similar situation).

There is more too. Despite bumps in COVID-19 cases after the state of emergency ended in June 2021, the Governor — as she says, without contradiction — has not (repeat, *not*) tried to reinstate it and impose anything like the complained-about restrictions. That detail rebuts Calvary's claim that the Governor has shown an "intent to reinstate" by her "moving the goalposts on pandemic-related sacrifices for months" even after decisions like Roman Cath. Diocese (emphasizing that governors cannot treat

- 19 -

religious exercises worse than secular activities, even during a pandemic) came down — "adopting new benchmarks that always seem to put restoration of religious liberty just around the corner" (Calvary based the first quote on its reading of United States v. Sanchez-Gomez, 138 S. Ct. 1532 (2018), and pulled the second and third quotes from Justice Gorsuch's statement in S. Bay United Pentecostal Church). Ultimately again (as we have been at pains to explain), the Governor's actions in response cut against applying the voluntary-cessation exception. See Bos. Bit Labs, 11 F.4th at 11. See generally Eden, LLC v. Justice, 36 F.4th 166, 171 (4th Cir. 2022) (holding that the governor's decision not to reinstitute certain COVID-19 policies during "deadly surges" is a "powerful signal that whatever course the . . . pandemic takes, a return to restrictions like those challenged here is highly unlikely" and adding that "it has become clear" over time "that there is 'no reasonable expectation' that COVID-19 restrictions like the ones to which the plaintiffs object will be reimposed'" (citing among other cases Bos. Bit Labs, 11 F.4th at 12, and Hawse, 7 F.4th at 693, and quoting Lighthouse Fellowship Church v. Northam, 20 F.4th 157, 162 (4th Cir. 2021))).

That is a good segue to Calvary's next problem. Still searching for a mic-drop moment, Calvary's opening brief argues that the Governor — who "vigorously" opposes Calvary's position —

- 20 -

"has laid the groundwork for imposing more, not fewer[,] restrictions going forward" and so has not shown that she will never resume the complained-about restrictions. But Calvary never explains there how her "vigorous[]" opposition and "groundwork"-laying (the key premises of this thesis) can hold up when (as we keep saying) the Governor ended the state of emergency and has not imposed restrictions similar to the old ones since (we repeat again for emphasis that Calvary's lead brief fails to acknowledge — let alone address — the state of emergency's ending). See generally Eden, LLC, 36 F.4th at 171 (finding it "entirely speculative to assert that the Governor suddenly will see a need to reinstate COVID-19 restrictions that have not been in place for more than a year," particularly since that period "has seen deadly surges in COVID-19 cases caused by the Delta and Omicron variants," and "[i]f there were any reasonable chance that the Governor might reimpose the safety measures, . . . then those waves of increased infection should have been the occasion for doing so" — "[b]ut they were not") (quotations omitted)).

The net result is that given these particularities, "it is unrealistically speculative" that the Governor would *again* proclaim a state of emergency and *then* reimpose restrictions similar enough to the prior restrictions to present essentially

- 21 -

the same legal dispute as the one alleged in Calvary's complaint. See Bos. Bit Labs, 11 F.4th at 11.

Perhaps in a last-ditch effort, Calvary protests that Bos. Bit Labs's mootness analysis holds no sway here because that case involved the First Amendment's free speech clause, while this case involves the First Amendment's free exercise clause. But we need only note (without delving into the merits) that because Calvary debuted this contention at oral argument, we hold it waived (and Calvary offers no sound basis for ignoring that deep-rooted waiver rule). See, e.g., Conduragis v. Prospect Chartercare, LLC, 909 F.3d 516, 518 n.2 (1st Cir. 2018).

## 2

That takes us then to the capable-of-repetition exception to mootness. As a refresher, a case "qualifies for that exception *only if* "(1) the challenged action [is] in its duration too short to be fully litigated [before] its cessation or expiration, *and* (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." See Weinstein, 423 U.S. at 149. And because (for the reasons just stated) the record discloses no reasonable expectation that a similar controversy will recur between the same litigants, Calvary flunks element (2) of the capable-of-repetition exception. So the matter remains moot. See Resurrection Sch., 35

F.4th at 530 (finding "[t]his exception is inapposite for largely the same reasons the [voluntary-cessation] exception is"); see also Doe v. Hopkinton Pub. Sch., 19 F.4th 493, 511 (1st Cir. 2021) (holding that plaintiffs did not meet the capable-of-repetition exception because they "fail[ed] to satisfy" the exception's "second prong"). See generally Murphy v. Hunt, 455 U.S. 478, 482 (1982) (per curiam) (underscoring that a "theoretical possibility" is not enough to bring this exception into play).

### 3

Two final points and we are done. First, Calvary thinks that it can avoid mootness because of the complaint's as-applied challenge, request for a permanent injunction, and allegation of a guarantee-clause violation (alleging a denial of a republican form of government). But all we need say (without getting into the weeds) is that Calvary waived these arguments by not making them in the district court when mootness concerns first took center stage after the Governor moved to dismiss the suit (and Calvary gives us no persuasive reason not to apply that familiar raise-or-waive rule (as it is known)). See, e.g., Eldridge v. Gordon Bros. Grp., LLC, 863 F.3d 65, 66 (1st Cir. 2017). And second, even though this case is moot, "nothing prevents" Calvary from "seeking" injunctive and declaratory relief "if" Calvary sees anything like the allegedly offending restrictions again (we of

- 23 -

course express no view on the likely outcome of such a suit).  See

Lewis, 813 F.3d at 59.

### III

We affirm the judge's dismissal of Calvary's suit as moot and award the Governor her costs on appeal.