# United States Court of Appeals
## For the First Circuit

No. 23-1867

NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.,

Plaintiff, Appellant,

v.

JANET L. YELLEN, in her official capacity as Secretary of Treasury, and JOSEPH R. BIDEN, in his official capacity as President of the United States,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Gelpí, Lipez, and Howard, Circuit Judges.

Thomas H. Geoghegan, with whom Depres, Schwartz & Geoghegan, Ltd., Shannon Liss-Riordan, Matthew Carrieri, Lichten & Liss-Riordan, P.C., Sarah E. Suszczyk, Patrick V. Dahlstrom, and Pomerantz LLP were on brief, for appellant.

Urja Mittal, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Joshua S. Levy, Acting U.S. Attorney, and Gerard Sinzdak, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellees.

November 1, 2024

**GELPÍ**, **Circuit Judge**.  Plaintiff-Appellant the National Association of Government Employees, Inc. ("NAGE") alleges that 31 U.S.C. § 3101(b) (the "Debt Limit Statute") is unconstitutional.  But this matter does not present a live case or controversy, precluding Article III adjudication on the merits of NAGE's constitutional challenge.  We affirm the district court's dismissal of this action.

## I.  BACKGROUND

We write primarily for the parties, assuming their familiarity with the travel of the case and laying out only those facts essential to our analysis.  See Gattineri v. Town of Lynnfield, 58 F.4th 512, 513 (1st Cir. 2023).  Because this appeal arises from a motion to dismiss for lack of jurisdiction at the pleadings stage, we take as true the well-pleaded allegations in the amended complaint and draw all reasonable inferences in NAGE's favor.  Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 46-47 (1st Cir. 2020); Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003).  "We also 'consider (a) implications from documents attached to or fairly incorporated into the [amended] complaint, (b) facts susceptible to judicial notice, and (c) [any] concessions in [the plaintiff]'s response to the motion to dismiss.'"  Wiener v. MIB Grp., Inc., 86 F.4th 76, 83 (1st Cir. 2023) (first and second alterations in original) (quoting Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020)).  In

addition, we may look beyond the complaint when assessing mootness. Cf. Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 68 n.23 (1997) (noting counsel's "duty . . . to bring to the federal tribunal's attention, 'without delay,' facts that may raise a question of mootness" (quoting Bd. of License Comm'rs of Tiverton v. Pastore, 469 U.S. 238, 240 (1985) (per curiam))); see also O'Neil v. Canton Police Dep't, 116 F.4th 25, 29-30 (1st Cir. 2024) (considering supplemental briefs and sworn statements by counsel after ordering the parties to address mootness); Ruskai v. Pistole, 775 F.3d 61, 67 (1st Cir. 2014) ("We have sometimes acknowledged . . . factual submissions, . . . at least where they raise a question of mootness." (collecting cases)).

In early 2023, Treasury Secretary Janet Yellen informed Congress that the United States would be unable to pay its accounts payable unless Congress acted to raise the debt limit set by the Debt Limit Statute.[1] To stave off the then-looming crisis, Secretary Yellen was authorized by statute to take certain actions,

---

[1] The Debt Limit Statute, 31 U.S.C. § 3101(b), prescribes a limit -- commonly referred to as "the debt ceiling" -- on "[t]he face amount of obligations issued under this chapter and the face amount of obligations whose principal and interest are guaranteed by the United States Government." Williams v. Lew, 819 F.3d 466, 469 (D.C. Cir. 2016) (alteration in original). First instituted in 1917, "[t]he original purpose of the Debt Limit Statute was to increase the Treasury Department's flexibility to manage the government's financial obligations." Id. (citations omitted).

such as declare a "debt issuance suspension period."[2] And, indeed, she did. Those efforts, however, only slowed the bleeding. Only months later, the U.S. government was nearly out of cash on hand to meet its financial obligations and approaching "an economic and financial catastrophe."

Believing that its members -- some 75,000 employees in various U.S. government agencies -- were then "at immediate and imminent risk of" being laid off or furloughed, working without pay, and losing funding in their pensions and retirement plans, NAGE sued Secretary Yellen and President Joseph R. Biden, in their official capacities, on May 8, 2023. The original complaint took aim at the Debt Limit Statute, alleging that if Congress did not raise the debt limit, Secretary Yellen and President Biden "w[ould] be required to take various major actions to determine priorities for spending or whether certain spending should occur at all

---

[2] A "debt issuance suspension period" is defined by statute as "any period for which the Secretary of the Treasury determines . . . that the issuance of obligations of the United States may not be made without exceeding the public debt limit." 5 U.S.C. § 8438(g)(6)(B). "[T]o prevent the United States from defaulting on its obligations," Treasury Secretaries have taken certain "extraordinary measures" during such periods, such as pausing reinvestment in retirement plans of government employees, suspending reinvestment of Treasury securities held in the Exchange Stabilization Fund, halting issuance of State and Local Government Series Treasury securities, and entering into a debt swap transaction with the Federal Financing Bank. See U.S. Dep't of the Treasury, Description of the Extraordinary Measures 2-4 (Jan. 19, 2023), https://home.treasury.gov/system/files/136/Description_Extraordinary_Measures-2023_01_19.pdf [https://perma.cc/J3TW-NF3F].

without any direction by Congress as to exercise of a function that belongs exclusively to Congress." Those maneuvers, NAGE asserted, would violate the separation-of-powers principles underlying the U.S. Constitution. NAGE sought declaratory and injunctive relief.

In the weeks after NAGE filed the original complaint, the United States inched closer to defaulting on its debt. According to NAGE, economists were prophesying that millions of jobs would be lost, that the stock market's value would halve, and that federal employees' paychecks would be delayed. And Secretary Yellen allegedly had already begun directing federal agencies to delay payment of certain invoices. As relevant here, from January 13 to June 3, 2023, Secretary Yellen instituted a debt issuance suspension period, granting her the ability, which she exercised, to temporarily suspend the issuance of new government obligations to the Thrift Savings Plan (the "G Fund") -- in which many NAGE members had elected to invest their personal savings.

But the anticipated "financial catastrophe" was averted when Congress stepped in, as it historically has. See U.S. Dep't of Treasury, Debt Limit (last visited Oct. 30, 2024), https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/debt-limit [https://perma.cc/8N6P-FVBG]; see also Williams v. Lew, 819 F.3d 466, 473 (D.C. Cir. 2016) ("It is indisputable that the United

States has never defaulted on its debt obligations."). On June 3, 2023, it enacted the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10, which approved a suspension of the debt limit until January 1, 2025. And although that law enabled the Treasury Secretary to end the debt issuance suspension period without running afoul of the debt limit and to fully reimburse[3] NAGE's members' accounts in the G Fund, the good times will not last, says NAGE. That is, NAGE believes that its members will again face certain monetary harm on January 2, 2025 -- the day the debt limit is statutorily scheduled to be reinstated. So NAGE amended its complaint on June 20, 2023, asserting that "[t]he injury which [it] alleged at the time of filing has not disappeared but will occur again, with certainty, under existing law" on January 2, 2025. Like the original complaint, the amended complaint seeks only declaratory and injunctive relief.

On July 24, 2023, Defendants-Appellees moved to dismiss the action for lack of subject matter jurisdiction. The district court granted the motion on October 18, 2023, reasoning that NAGE's amended complaint did not allege a redressable injury as to its

---

[3] Federal law requires that the G Fund be made whole -- i.e., that the G Fund accounts receive funds sufficient to replicate the investments that they would have accrued had the debt issuance suspension period not occurred -- "[u]pon expiration of the debt issuance suspension period," but only if "such issuances can be issued without exceeding the public debt limit." 5 U.S.C. § 8438(g)(1)-(5).

- 6 -

members' past losses in their G Fund accounts, that it did not allege a sufficiently imminent prospective injury as to any future G Fund losses and paycheck delays, and that its members' claims of injury based on past threats of paycheck delays was moot.

NAGE appealed.

## II. DISCUSSION

Article III of the Constitution limits the jurisdiction of federal courts to actual "cases" and "controversies." U.S. Const. art. III, § 2. Essential to defining this fundamental limitation on "the judiciary's proper role in our system of government" are the doctrines of standing and mootness. Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 598 (2007) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)); see O'Neil, 116 F.4th at 30. These "intertwined doctrines," O'Neil, 116 F.4th at 30, mandate that a plaintiff have a "personal stake" at the outset of an action (standing) and throughout all stages of review (mootness), Becker v. Fed. Election Comm'n, 230 F.3d 381, 385, 386 n.3 (1st Cir. 2000). The personal-stake requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches," Hollingsworth v. Perry, 570 U.S. 693, 704 (2013) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)), and so it must be evaluated "in advance of any determination on the merits," ACLU of Mass. v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (citing Arizonans

for Off. Eng., 520 U.S. at 67).  Accordingly, if a party lacks standing, or if intervening developments deprive the party of an ongoing personal stake in the litigation, the action must be dismissed.  Hollingsworth, 570 U.S. at 704-05; see also United States v. Rydle, 58 F.4th 14, 17 (1st Cir. 2023) ("If 'the issues presented are no longer "live,"' then the case is moot, and we must dismiss for want of jurisdiction." (quoting Harris v. Univ. of Mass. Lowell, 43 F.4th 187, 191 (1st Cir. 2022))).

With that backdrop in mind, we consider whether the instant matter presents a case or controversy over which we have jurisdiction.  Our review is de novo.  O'Neil, 116 F.4th at 30.

### A. Standing

We begin with NAGE's standing.  For a plaintiff to have Article III standing, we determine whether it has asserted at the commencement of the litigation a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Hein, 551 U.S. at 598 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)); accord O'Neil, 116 F.4th at 30-31.  The alleged injury must be "concrete and particularized," not "conjectural" or "hypothetical."  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

"[A] plaintiff must 'demonstrate standing separately for each form of relief sought.'"  TransUnion LLC v. Ramirez, 594 U.S.

- 8 -

413, 436 (2021) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 185 (2000)).  Past harm is insufficient to "confer standing to seek forward-looking declaratory or injunctive relief"; there must be "ongoing injury or a sufficient threat that the injury will recur."  Roe v. Healey, 78 F.4th 11, 21 (1st Cir. 2023) (first citing Efreom v. McKee, 46 F.4th 9, 21-22 (1st Cir. 2022); and then citing City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)).  The risk of future harm must be "sufficiently imminent and substantial."  Id. at 20 (quoting TransUnion LLC, 594 U.S. at 435).  "[T]his standard is satisfied 'if the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur.'"  Id. (quoting Susan B. Anthony List, 573 U.S. at 158).  "A threatened harm that is too attenuated or too speculative" will not do.  Id. at 20-21 (first citing Clapper, 568 U.S. at 410; and then citing TransUnion LLC, 594 U.S. at 437-38).

Here, NAGE has never had Article III standing to pursue prospective relief because its anticipated future harms -- based on its predictions of future debt issuance suspension periods and paycheck delays -- are far too speculative.  In both its original and amended complaints, NAGE requests forward-looking relief due to hypothetical injuries that would materialize only in the event of a default by the U.S. federal government.  Accepting that premise, however, would require us to disregard Congress's long

and unfailing history of intervening before the debt limit is reached. It is undisputed that NAGE's feared national bankruptcy has never come to fruition. Indeed, in just the last fifty-four years, Congress has "permanently raise[d], temporarily extend[ed], or revise[d] the definition of the debt limit" seventy-eight times -- "[forty-nine] times under Republican presidents and [twenty-nine] times under Democratic presidents." Debt Limit, https://perma.cc/8N6P-FVBG. Any forecasted injuries based on the possible-but-yet-to-ever-occur bankruptcy of the federal government are insufficient to establish likely future harm. See Clapper, 568 U.S. at 409 ("[W]e have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." (second alteration in original) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (collecting cases)).

We find support for that conclusion in the D.C. Circuit's decision in Williams v. Lew, 819 F.3d 466 (D.C. Cir. 2016). There, a holder of U.S. public debt sued then-Treasury Secretary Jacob Lew, challenging the constitutionality of the Debt Limit Statute. See generally id. The D.C. Circuit held that the plaintiff's claims "[we]re entirely conjectural." Id. at 473. For one thing, the D.C. Circuit recognized, as we do here, "that the United States

- 10 -

has never defaulted on its debt obligations." Id. (citations omitted). The D.C. Circuit further elaborated:

> [A]ny future injury that [the plaintiff] might suffer follow[ed] from an extended chain of contingencies. In particular: (1) federal debt must reach the statutory ceiling; (2) the Treasury Department must exhaust any "extraordinary measures" to avoid a default; (3) the United States must be unable to pay its obligations with "cash on hand" in a given day; (4) payment on [the plaintiff's] securities must come due during such time; and (5) [the plaintiff] must continue to hold those securities. Furthermore, Congress must fail to enact legislation suspending or increasing the debt limit despite an impending breach of the statutory ceiling -- something it has done on over seventy occasions since 1962.

Id. (citations omitted). NAGE's asserted future harm relies on a similarly speculative chain of events, including an event that has never occurred in the history of the United States. That is a far cry from harm that is certainly impending or substantially likely to occur.

Specifically as to the G Fund, NAGE's efforts to establish likely future harm based on the Treasury Secretary again temporarily pausing investments in the G Fund during a future debt issuance suspension period are likewise unavailing. NAGE has not shown that its members suffered any harm during the two recent debt issuance suspension periods in 2011 and 2023. Undeniably, each time the Treasury Secretary paused investing in the G Fund, he/she later followed through on his/her statutorily mandated

- 11 -

obligation to make whole the G Fund's accountholders. See 5 U.S.C. § 8438(g). Considering Congress's consistent history of intervening before the debt limit is reached alongside § 8438(g)'s guarantee, we cannot find that NAGE has established any risk of future harm stemming from another debt issuance suspension period.

Because NAGE's pleadings fail to establish a substantial risk of future harm, it does not have standing to pursue prospective relief. See Healey, 78 F.4th at 21.

### B. Mootness

To the extent that NAGE attempts to construe its members' pecuniary injuries in 2023 -- the suspended reinvestment of the G Fund and contemplated paycheck delays -- as somehow ongoing notwithstanding the Fiscal Responsibility Act's passage, this argument fares no better. There is no question that the Act mooted NAGE's claims based on its members' past injuries, as NAGE does not claim that the Treasury Secretary failed to make whole its members' G Fund accounts following the debt issuance suspension period as required by § 8438(g)(3), nor does NAGE allege that she ever actually delayed its members' paychecks. Therefore, even assuming any temporary injuries were redressable by a court in 2023, it is simply impossible for a court to "fashion a remedy that will at least lessen the[se] injur[ies]" today. In re Fin. Oversight & Mgmt. Bd. for P.R., 995 F.3d 18, 22 (1st Cir. 2021) (quoting Dantzler, Inc., 958 F.3d at 49). Without a persisting

- 12 -

redressable injury, NAGE no longer has a personal stake in the action -- or, in other words, its claims based on its members' alleged past injuries are now moot.  <u>Friends of the Earth, Inc.</u>, 528 U.S. at 189-90 (explaining that an action is mooted by the loss of a personal stake mid-litigation unless an exception to mootness applies).

Our analysis does not stop there, however, because NAGE contends that two exceptions to mootness apply to its claims.  We can dispose of those arguments in short order.

First, NAGE invokes the voluntary-cessation exception, which may apply when "'a defendant voluntar[ily] ceases the challenged practice in order to moot the plaintiff's case and there exists a reasonable expectation that the challenged conduct will be repeated' after the suit's 'dismissal.'"  <u>Bos. Bit Labs, Inc.</u> v. <u>Baker</u>, 11 F.4th 3, 9 (1st Cir. 2021) (alteration in original) (quoting <u>Town of Portsmouth</u> v. <u>Lewis</u>, 813 F.3d 54, 59 (1st Cir. 2016)).  The exception "exists to stop a scheming defendant from trying to 'immuniz[e] itself from suit indefinitely' by unilaterally changing 'its behavior long enough to secure a dismissal' and then backsliding when the judge is out of the picture."  <u>Id.</u> at 10 (alteration in original) (quoting <u>Lewis</u>, 813 F.3d at 59).  "But [it] does <u>not</u> apply if the change in conduct is <u>unrelated</u> to the litigation."  <u>Calvary Chapel of Bangor</u> v. <u>Mills</u>,

52 F.4th 40, 47 (1st Cir. 2022) (quotation marks omitted) (quoting Bos. Bit Labs, 11 F.4th at 10).

Here, we agree with the district court that there is no indication that the passage of the Fiscal Responsibility Act by Congress -- a political branch different from that of the defendants in the instant suit -- was done for reasons related to this litigation.[4] See Lewis, 813 F.3d at 59 (declining to apply the voluntary-cessation exception where "there [wa]s no basis upon which to conclude that the state legislature [took a legislative action] to make the present litigation moot"); cf. Diffenderfer v. Gomez-Colon, 587 F.3d 445, 452 (1st Cir. 2009) (collecting cases and explaining that "legislation is generally considered an

---

[4] NAGE argues that the Supreme Court's decision in West Virginia v. EPA, 597 U.S. 697 (2022), changes our analysis. Now, NAGE presses, voluntary cessation cannot moot a case "unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. (quoting Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 719 (2007)). But unilateral discretion, like that exercised by the EPA in West Virginia, is not at issue here. Whereas in West Virginia there was nothing, besides the EPA's own discretion, to stop it from later resuming its challenged conduct, here, two branches of government (including one that is not a party to this case and comprises two independently acting bodies) must elect through their inaction to force the Treasury Secretary to announce another debt issuance suspension period. Likewise, both Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14 (2020) and Bayley's Campground Inc. v. Mills, 985 F.3d 153 (1st Cir. 2021), also involved executive officials' rescissions of orders that they could later reimpose regardless of their corresponding legislatures' approval. We need not be as unforgiving of executive officials like those in this case, whose ability to backtrack their cessation of challenged conduct is at the mercy of decidedly independent legislative bodies.

- 14 -

intervening, independent event and not voluntary action, particularly when the governmental entity taking the appeal, as here, is not part of the legislative branch").

Second, NAGE seeks haven in the mootness exception for injuries capable of repetition yet evading review. It "'applies only in exceptional situations' where a plaintiff can show that '"(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."'" ACLU of Mass., 705 F.3d at 57 (quoting Gulf of Me. Fisherman's All. v. Daley, 292 F.3d 84, 89 (1st Cir. 2002)).

Our analysis starts and ends with the second prong. For the reasons discussed above, NAGE cannot show, based on only the two instances in the entire history of the Debt Limit Statute that it identifies in its amended complaint, that there is a "reasonable expectation" that its members will experience harm arising out of a debt issuance suspension period in which the Treasury Secretary exercises his/her right to suspend investments in the G Fund.[5]

In sum, NAGE has not demonstrated that either exception to mootness applies. We accordingly agree with the district court

_____

[5] We note that the only harm NAGE's members claim to have suffered as a result of the debt issuance suspension period was monetary. To the extent NAGE's members are not made whole following a debt issuance suspension period, they "might bring

- 15 -

that the matter before us is moot as to any of NAGE's alleged past injuries and thus presents no live case or controversy.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **affirmed**.

---

damages actions," and in that way, "the [Treasury's] practices [would] not 'evade review.'" Alvarez v. Smith, 558 U.S. 87, 94 (2009) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 8-9 (1978)); cf. Lyons, 461 U.S. at 111 (explaining that constitutionality "can be determined" retroactively, "in [a] suit for damages"). We express no opinion as to the legal soundness of such a suit.